UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FREDERICK BARTON DANNER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CAESARS ENTERTAINMENT CORPORATION and CAESARS ENTERTAINMENT OPERATING COMPANY, INC.,[1] <br><br> Defendants. | No. 14-cv-7973-SAS <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Frederick Barton Danner, individually and on behalf of all others similarly situated, by his undersigned counsel, alleges the following upon personal knowledge as to his own acts and upon information and belief based upon the investigation conducted by counsel as to all other matters.

### THE AMENDED COMPLAINT AND THE APPLICATION OF THE AUTOMATIC STAY TO ACTIONS AGAINST CAESARS ENTERTAINMENT OPERATING COMPANY, INC.

1.     **At the time of this Amended Complaint, Defendant Caesars Entertainment Operating Company, Inc. ("CEOC") is a Debtor under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101, et seq. The Court was advised on January 13, 2015 and**

---

[1]     While the caption of this matter remains the same as in the Plaintiff's original Complaint, as set forth in this Court's Order dated January 15, 2015 (D.I. 21), Plaintiff's claims as against Defendant Caesars Entertainment Operating Company, Inc. ("CEOC") are stayed pursuant to Section 362(a) of Title 11 of the United States Code based on Chapter 11 petitions filed with respect to CEOC in both the United States Bankruptcy Courts for the District of Delaware and for the Northern District of Illinois. For the avoidance of doubt, and notwithstanding anything else stated herein, Plaintiff's amendment of his Complaint with the filing of this Amended Complaint *is not and should not be deemed an attempt to commence or continue an action against CEOC, to collect a*

**January 15, 2015 that chapter 11 cases were filed in the Bankruptcy Courts for the District of Delaware and Northern District of Illinois, respectively. [D.I. 19, 20] This Amended Complaint is filed with the consent of CEC, and is filed solely with respect to CEC. Notwithstanding anything else stated herein, this Amended Complaint is not and should not be deemed an attempt to commence or continue an action against CEOC, to collect a debt against CEOC, or to take any action in violation of the automatic stay.**

<u>**NATURE OF THE ACTION**</u>

2.     This is a class action against Caesars Entertainment Corporation ("**<u>CEC</u>**") and Caesars Entertainment Operating Company, Inc. (together with CEC, "**<u>Caesars</u>**") brought by Plaintiff, individually and on behalf of all persons who beneficially held 6.50% Senior Notes due 2016 (the "**<u>2016 Notes</u>**") issued by CEOC and guaranteed by CEC (the "**<u>Class</u>**") from August 11, 2014 to the present (the "**<u>Class Period</u>**").  The 2016 Notes were issued by CEOC pursuant to a June 9, 2006 indenture (the "**<u>2016 Notes Indenture</u>**"), and are subject to the Trust Indenture Act of 1939, 15 U.S.C. §§77aaa, *et seq*. (the "**<u>TIA</u>**").[2]

3.     On August 12, 2014, Caesars announced a transaction intended to release CEC from its guarantee obligation on the 2016 Notes as well as certain and 5.75% Senior Notes due 2017 (the "**<u>2017 Notes</u>**," and with the 2016 Notes, the "**<u>Legacy Notes</u>**").[3]  Under the August 12 transaction, Caesars entered into a Note Purchase and Support Agreement (the "**<u>Agreement</u>**"), whereby CEC agreed to pay certain preferred noteholders ("**<u>Preferred Noteholders</u>**") a ratable amount of $77.7 million of cash in the aggregate, and CEOC agreed to pay the Preferred

---

*debt against CEOC or take any other action in violation of the automatic stay imposed by Section 362 of Title 11 of the United States Code.*

[2]     A copy of the 2016 Notes Indenture is attached hereto as Ex. A.

[3]     Although the 2017 Notes were also subject to the transactions discussed herein, they are not subject to this action.

Noteholders a ratable amount of $77.7 million of cash in the aggregate plus accrued and unpaid interest in cash. [4] Additionally, the Preferred Noteholders are to be indemnified by CEC – the solvent and amply capitalized parent corporation – for any liability "arising out of, related to or in connection" with this transaction. This private transaction was agreed to by holders representing $237.8 million aggregate principal amount of the Legacy Notes and greater than 51% of each issue of the Legacy Notes. Such noteholders agreed to sell $89.4 million of the 2016 Notes and $66.0 million of the 2017 Notes, each at par. More succinctly, Caesars paid a windfall to the Preferred Noteholders, who controlled the necessary 51% of the Legacy Notes, in order to enact a scheme designed to release CEC from its guarantee obligations.

4.     While Caesars repurchased $155.4 million in face amount of Legacy Notes, Caesars did not purchase the entire Legacy Note holdings of the Preferred Noteholders. Rather, Caesars purchased just enough Legacy Notes to return to these investors the then current trading value of the bonds (roughly $0.65/$1.00 of face value), and to permit these privileged investors to avoid the results of a Caesars' plan to strip CEC's guarantee of 2016 Notes under Article XV of the 2016 Notes Indenture (the "**Guarantee**") as well as the guarantee of the 2017 Notes under its indenture.

5.     In return, Caesars required that the Preferred Noteholders vote all Legacy Notes held by them to (i) amend the Indentures to strip CEC's Guarantee, a modification that applied to all the Legacy Notes, and (ii) modify the Indentures restriction on the sale of substantially all of CEOC's assets (the "**Covenants Against Fundamental Changes**" and with the removal of the

---

4     *See* Ex. B (CEOC's Form 8-K filed on August 12, 2014); Ex. C (Note Purchase and Support Agreement entered into as of August 12, 2014 by and among CEOC, CEC, and certain undisclosed holders of CEOC's 6.5% Senior Notes due 2016 and/or 5.75% Senior Notes due 2017), Ex. D (CEOC's Form 8-K filed on August 22, 2014), Ex. E (CEOC's Form 8-K/A filed on August 25, 2014), Ex. F (First Supplemental Indenture dated as of August 22, 2014, by and among CEOC, as issuer, CEC, as Guarantor, and Law Debenture Trust Company of New York, as successor trustee.), Ex. G (Second Supplemental Indenture dated as of August 22, 2014, by and among CEOC, as issuer, CEC, as Guarantor, and Law Debenture Trust Company of New York, as successor trustee.).

guarantee, the "**Amendments**").  The Preferred Noteholders also agreed to support any future restructuring proposed by Caesars, subject to certain conditions.  The modifications to the 2016 Notes Indenture were made without the consent of Plaintiff and the other Non-Preferred 2016 Noteholders, in violation of the 2016 Notes Indenture and the TIA.  Similarly, modifications to the indenture for the 2017 Notes were made without the consent of the other non-preferred 2017 Noteholders.

6.      The process leading up to the Agreement was not a public process subject to full bondholder participation, but instead a secret deal with a group of Legacy Note holders selected by Caesars.  The existence of the Agreement was first disclosed on August 12, 2014, when Caesars mentioned in a Form 8-K filed with the U.S. Securities and Exchange Commission ("**SEC**") that it had entered into the Agreement.  *See* CEOC Form 8-K filed Aug. 12, 2014.  The Agreement itself was not made available until August 14, 2014, when CEOC filed its Quarterly Report on Form 10-Q.  *See* Note Purchase and Support Agreement, attached to CEC's Form 10-Q, filed Aug. 14, 2014.  The Agreement was consummated on August 22, 2014, and publicly announced by CEOC in a Form 8-K filed with the SEC.  *See* CEOC Form 8-K, filed Aug. 22, 2014.  On August 25, 2014, CEOC filed the supplemental indentures for the 2016 Notes (the "**2016 Notes Supplemental Indenture**") and the 2017 Notes as of August 22, 2014.  *See* CEOC Form 8-K/A and exhibits, filed Aug. 25, 2014.  As part of this transaction, CEC and CEOC retired $582 million of Legacy Notes, including $89.4 million in 2016 Notes purchased from the Preferred Noteholders and $186.9 million of 2016 Notes previously owned by CEC affiliate Caesars Growth Properties.

7.      Caesars did this without offering to purchase all Legacy Notes held by *all* security holders.  Instead, Caesars made the Preferred Noteholders a sweetheart offer to buy the 51% of

the vote it would need to amend the Indentures. The remaining 2016 Noteholders, on the other hand, were stripped of the valuable CEC Guarantee, and left holding unsecured indebtedness issued by CEOC, an insolvent entity that is unlikely to ever be able to satisfy the 2016 Notes. CEOC has an unsustainable debt load, has reported disappointing financial results, and has been looted for the benefit of CEC and the affiliates of Caesars' financial sponsors, Apollo and TPG. The 2016 Notes, as a practical matter, are worthless, and Plaintiff's rights under the 2016 Notes Indenture and federal law have been impaired.

8. If defendants' actions are allowed to stand, CEC will have repudiated any financial responsibility for the 2016 Notes, and leave the 2016 Noteholders with no practical prospect of a meaningful recovery. The actions of Caesars, with the acquiescence of Law Debenture Trust Company of New York, as successor indenture trustee, also amounted to a constructive partial redemption of certain 2016 Notes held by its Preferred Noteholders without a fair and appropriate selection process for the 2016 Notes purchased, in violation of the 2016 Notes Indenture.

9. The 2016 Notes Supplemental Indenture was purportedly effectuated by a mere majority vote, a process expressly forbidden by the 2016 Notes Indenture and federal law, because the removal of the Guarantee ultimately affected the 2016 Noteholders' unconditional right to receive payment on the 2016 Notes. The 2016 Notes Indenture, by its terms, requires unanimous consent of all holders for any change that would impair the right to receive payment of principal and interest, and the right to institute suit for payment. *See* 2016 Notes Indenture §§ 508, 902. These same rights are similarly protected under Section 316(b) of the TIA.

10. The marketplace has confirmed how damaging these actions were to the remaining 2016 Noteholders. Trading prices for the 2016 Notes declined from $0.725/$1.00 of

face value immediately before the Agreement was disclosed to $0.34/$1.00 of face value as of September 24, 2014.

11.     The financial press called this scheme "one of the most egregious things they've done so far," and observed that the "consequence of this approach for the junior bondholders excluded from last week's deal is that they will be left out in the cold."  Keller, Laura J., *Caesars Divides Lenders to Conquer Talks: Distressed Debt*, BLOOMBERG, Aug. 22, 2014.

12.     Lastly, the Amendments are part of Caesars' larger plan to move CEOC's most valuable assets beyond the reach of creditors, thus enriching CEC, its shareholders and its affiliates at the expense of CEOC's creditors, including the Non-Preferred Legacy Noteholders. Beginning in 2010, Caesars started removing valuable assets from CEOC's enterprise.  For example, in 2011, CEOC's indirectly owned subsidiary transferred its interactive gaming operations to a subsidiary of CEC, for little or no consideration.  Two years later, in September 2013, CEOC transferred two of CEOC's significant Las Vegas properties to Caesars Entertainment Resort Properties ("**Resort Properties**"), another affiliate of CEC.  In October 2013, Caesars engaged in a series of transactions that moved some of CEOC's most valuable assets from CEOC to Caesars Growth Partners, LLC ("**Growth Partners**"), a newly-formed entity 42% owned by Apollo Global Management, LLC ("**Apollo**"), TPG Capital, LP ("**TPG**"), private equity firms that acquired CEC in a highly levered buyout in January 2008 ("**Buyout**"), and other participating shareholders of CEC, and 58% owned by CEC. In March 2014, CEOC transferred four additional significant properties and control over its Total Rewards Program to Resort Properties and Growth Partners. The Total Rewards Program – a massive store of customer data and intellectual property – is CEOC's most valuable asset.  Lastly, in May 2014, Caesars employed a guarantee busting strategy to evade its guarantee obligations by selling 5%

of CEOC's common equity to a third party. Caesars made these transfers with the purpose of depriving CEOC's creditors of the revenue generated by these assets, and thus permanently curtailed CEOC's ability to service its debt load with revenue from operations. Caesars removed CEOC's most valuable assets from the reach of CEOC's creditors, and simultaneously made CEOC's default on its debts virtually inevitable.

13.     On January 12, 2015, an involuntary bankruptcy petition as to CEOC was filed by certain of its second-lien bondholders in the United States Bankruptcy Court for the District of Delaware. Three days later, on January 15, 2015, CEOC itself filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois. The latter Chapter 11 filing followed CEOC's agreement to do so pursuant to the terms of a restructuring support agreement entered with CEC and certain of its first lien noteholders. The restructuring support agreement provides that the plan of reorganization will settle all claims and causes of action against CEC, including Plaintiff's, through a non-consensual third party release. CEC's demand for non-consensual third party releases and the law in the Seventh Circuit on the subject was one of the main reasons why CEOC filed for Chapter 11 relief in the Bankruptcy Court for the Northern District of Illinois. In light of these filings, and the consequences of such filings under the 2016 Notes Indenture, Plaintiff has filed this Amended Complaint.

14.     Caesars' course of conduct violates the terms of the 2016 Notes Indenture and the TIA, and entitles Plaintiff to declaratory and monetary relief.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action under Section 322(b) of the TIA, 15 U.S.C. §77vvv(b), Section 22(a) of the Securities Act of 1933, 15 U.S.C. §77v(a), and 28 U.S.C. §§1331 and 1367.

16. This Court has personal jurisdiction over defendants under N.Y.C.P.L.R §302(a) because defendants maintain sufficient minimum contacts in this jurisdiction, including the marketing and selling of the 2016 Notes.

17. Venue is proper in this District pursuant to Section 322(b) of the TIA, 15 U.S.C. §77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. §77v(a), and 28 U.S.C. §1391(b) and (c). Defendants transact business within this District, and a substantial part of the events and omissions giving rise to the claims occurred in this District, including the marketing and sale of the 2016 Notes.

## PARTIES

18. Plaintiff beneficially held the 2016 Notes issued by CEOC throughout the Class Period, and has been harmed as a direct result of Defendants' wrongful conduct alleged herein.

19. Defendant CEC, formerly known as Harrah's Entertainment, Inc., is a Delaware corporation headquartered in Las Vegas, Nevada. CEC, through its affiliates, owns, manages, or operates dozens of casinos throughout the United States and internationally. Private equity firms Apollo and TPG acquired CEC in the 2008 leveraged Buyout, and continue to own most of CEC's stock and control its operations. CEC is traded on the NASDAQ Global Market under the symbol "CZR."

20. Defendant CEOC is a Delaware corporation headquartered in Las Vegas, Nevada that owns and operates casinos and other entertainment properties in Las Vegas and elsewhere in

the United States and internationally. CEOC was formerly known as Harrah's Operating Company, Inc. CEOC is a direct operating subsidiary of CEC. Until May 5, 2014, CEC owned all of CEOC's common stock and continues to own at least 89% of CEOC's common stock. As a result of (i) the January 12, 2015 involuntary petition filed in the Bankruptcy Court for the District of Delaware by certain of CEOC's second-lien bondholders, and (ii) the January 15, 2015 voluntary petition filed in the Bankruptcy Court for the Northern District of Illinois by CEOC, Bankruptcy Code Section 362 caused the automatic stay to this action as to CEOC, but not CEC. For the avoidance of doubt, as previously stated, and notwithstanding anything else stated herein, this Amended Complaint is not and should not be deemed an attempt to commence or continue an action against CEOC, to collect any debt against CEOC or take any other action in violation of the automatic stay.

## BACKGROUND OF DEFENDANTS' WRONGFUL CONDUCT

21. On June 9, 2006, CEOC completed an underwritten offering of the 2016 Notes, with a $750 million aggregate principal amount, pursuant to the 2016 Notes Indenture. On September 28, 2005, CEOC completed an underwritten offering of the 2017 Notes, with a $750 million aggregate principal amount, pursuant to an indenture dated as of that date (with the 2016 Notes Indenture, the "**Indentures**"). Under the Indentures, CEC is the guarantor and U.S. Bank National Association ("**U.S. Bank**") was the Trustee. On August 11, 2014, the Law Debenture Trust Company of New York replaced U.S. Bank as successor indenture trustee with respect to the Legacy Notes. Plaintiff is a beneficial holder of 2016 Notes.

22. As a result of Caesars' wrongful conduct described herein, the 2016 Notes have been stripped of their value.

**Key Provisions of the 2016 Notes Indenture**

23.     Under the 2016 Notes and the 2016 Notes Indenture, all beneficial holders have the right to receive principal and interest. Specifically, Section 508 of the 2016 Notes Indenture provides:

> Notwithstanding any other provision in this Indenture, the Holder of any Security shall have ***the right, which is absolute and unconditional, to receive payment of the principal of*** and any premium and (subject to Section 307) ***interest on such Security*** on the respective Stated Maturities expressed in such Security (or, in the case of redemption, on the Redemption Date) ***and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder***.

2016 Notes Indenture, § 508 (emphasis added).

24.     The provisions of Section 508 of the 2016 Notes Indenture are mandated by Section 316(b) of the TIA, 15 U.S.C. §77ppp(b), which the 2016 Notes Indenture acknowledges. *See* 2016 Notes Indenture, at i.

25.     Section 107 of the 2016 Notes Indenture makes clear that if any provision of the 2016 Notes Indenture conflicts with a provision of the TIA, the TIA provision controls:

> If any provision hereof limits, qualifies or conflicts with a provision of the Trust Indenture Act which is required under such provision of the Trust Indenture Act to be a part of and govern this Indenture, the latter provision shall control. If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act which be so modified or excluded, the latter provision shall be deemed to apply to this Indenture as so modified or to be excluded, as the case may be.

2016 Notes Indenture, § 107.

26.     Article XV of the 2016 Notes Indenture sets forth CEC's unconditional guarantee of the 2016 Notes. Section 1501(1) states, in relevant part:

> the Guarantor hereby ***irrevocably and unconditionally guarantees*** (such guarantee being the *"Guarantee")* to each Holder of a Security of any series authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture and the Securities of any series hereunder, that: (i) the principal of, premium, if any,

and interest on the Securities of such series promptly will be paid in full when due, whether at the Maturity, by acceleration, call for redemption or otherwise, and interest on the overdue principal, premium, if any, and interest, if any, of such Securities, if lawful, and all other obligations of the Corporation to the Holders of such Securities and the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof, and (ii) in case of any extension of time of payment or renewal of the Securities of any series or any of such other obligations, the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise.

*** 

The Guarantor **hereby agrees that its obligations hereunder shall be unconditional, irrespective of** the validity, regularity or enforceability of the Securities of any series or this Indenture, the absence of any action to enforce the same**, any waiver or consent by any Holder of such Securities with respect to any provisions hereof** or thereof, the recovery of any judgment against the Corporation, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

2016 Notes Indenture, § 1501(1) (emphasis added).

27.     Article XV of the 2016 Notes Indenture sets forth the only conditions under which the Guarantee may be released.  Section 1503(3) states, in relevant part:

The Guarantor shall be released from all of its obligations under the Guarantee with respect to Securities of any series and under this Indenture if:

(3) the Corporation ceases for any reason to be a "wholly owned subsidiary" of the Guarantor (as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC).

2016 Notes Indenture, § 1503(3).  Rule 1-02(aa) (formerly Rule 1-02(z)) of the Regulation S-X defines "wholly owned subsidiary" as "a subsidiary substantially all of whose outstanding voting shares are owned by its parent and/or the parents other wholly owned subsidiaries."  17 C.F.R. 210.1-02(aa).

28.     Section 801 of the 2016 Notes Indenture, the Covenants Against Fundamental Changes, severely limits Caesars' ability to transfer all or substantially all of CEOC's assets, and provides in relevant part:

> The Corporation shall not consolidate with or merge with or into any other Person or, directly or indirectly, sell, lease or convey all or substantially all of its assets to another Person, and may not permit any Person to, directly or indirectly, sell, lease or convey all or substantially all of its assets to the Corporation, whether in a single transaction or a series of related transactions, unless:
>
> (i) the surviving entity (if other than CEOC) expressly "assumes all the obligations of [CEOC]" under the Indenture, (ii) no event of default would occur, and (iii) CEOC delivers to the Trustee the appropriate officers certificate and opinion of counsel that it has complied with all conditions precedent required by the Indenture.

2016 Notes Indenture, § 801.  The Supplemental Indenture amends Section 801 to add "held as of August 22, 2014" between "directly or indirectly, sell, lease or convey all or substantially all of its assets" and before "to another Person."

29.     Caesars contends that the Agreement and the 2016 Notes Supplemental Indenture were proper because they were agreed to by those who owned a majority, as measured by principal amount, of the 2016 Notes.  Section 902 of the 2016 Notes Indenture provides in relevant part:

> The Corporation, the Guarantor and the Trustee may enter into a supplemental indenture **with the written consent of the Holders of at least a majority in principal amount of the Outstanding Securities of each series affected by such supplemental indenture** (including consents obtained in connection with a tender offer or exchange offer for the Securities of such series), for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of any supplemental indenture or of modifying in any manner the rights of the Holders of the Securities of such series; **provided, however, that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Security affected thereby**,
>
> <div align="center">***</div>
>
> (4)     **modify any of the provisions of this Section, Sections 508**, 513, 116 or 1006, except to increase any such percentage or to provide that certain other

provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Security affected thereby

2016 Notes Indenture, § 902(4) (emphasis added).

30.     The elimination of the Guarantee effectively modified (or, more pointedly, gutted) Section 508 of the 2016 Notes Indenture.  This provision is the irreducible core of the 2016 Notes' investment – the 2016 Noteholders' unconditional right to receive payment of the principal and interest on the 2016 Notes – and may not be modified by mere majority consent under Section 902 of the 2016 Notes Indenture.  Instead, the right to receive payment of the principal and interest on the 2016 Notes cannot be impaired without *each* bondholder's specific consent.

31.     Section 501(5)(a) of the 2016 Notes Indenture provides that commencement of a voluntary bankruptcy case constitutes an event of default, upon which CEOC and CEC's obligations under the 2016 Notes become immediately due. 2016 Notes Indenture, § 501(5)(a). Section 501 provides in pertinent part:

"Event of Default," wherever used herein with respect to the [Notes], means any one of the following events . . . (5) [CEOC] or any of its Significant Subsidiaries pursuant to or within the meaning of any Bankruptcy Law: (a) commences a voluntary case.

2016 Notes Indenture, § 501(5)(a).

32.     Additionally, Section 502 of the 2016 Notes Indenture states in relevant part:

If an Event of Default specified in Section 501(5)(a) shall occur, the principal amount (or specified amount) of and accrued and unpaid interest, if any, on all outstanding [2016 Notes] shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

2016 Notes Indenture, § 502.

33.     Moreover, under the 2016 Notes Indenture, 2016 Notes owned by CEOC or an Affiliate (as used and defined in the 2016 Notes Indenture) cannot be counted in determining

whether the majority consented to a supplemental indenture. The definition of "Outstanding" under Section 101 of the 2016 Notes Indenture states:

> [I]n determining whether the Holders of the requisite principal amount of the Outstanding Securities have given, made or taken any request, demand, authorization, direction, notice, consent, waiver or action hereunder as of any date, . . . (D) Securities owned by the Corporation or any other obligor upon the Securities or any Affiliate of the Corporation or of any such other obligor, whether of record or beneficially, shall be disregarded and deemed not to be Outstanding . . . ."

2016 Notes Indenture, § 101.

34.     Affiliate is defined in the Indenture as:

> "Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

2016 Notes Indenture, § 101.

35.     The 2016 Notes Indenture also requires, in the case of the redemption of less than all 2016 Notes, that the Trustee must to treat all noteholders fairly and appropriately:

> ***If less than all the Securities of any series are to be redeemed*** (unless all the Securities of such series and of a specific tenor are to be redeemed or unless such redemption affects only a single Security), the particular Securities to be redeemed shall be selected not more than 60 days prior to the Redemption Date by the Trustee, from the Outstanding Securities of such series not previously called for redemption, ***by such method as the Trustee shall deem fair and appropriate*** and which may provide for the selection for redemption of a portion of the principal amount of any security of such series…

2016 Notes Indenture, § 1103 (emphasis added).

36.     Section 905 of the 2016 Notes Indenture requires that every supplemental indenture comply with the TIA. "Every supplemental indenture executed pursuant to this Article

shall conform to the requirements of the Trust Indenture Act as then in effect." 2016 Notes Indenture, § 905.

37.     The Amendments to the 2016 Notes Indenture, together with Caesars' ongoing "restructuring" of CEOC's debt through the planned insolvency of CEOC, will effectively eliminate Plaintiff's ability to receive payment on the 2016 Notes from CEOC and deny Plaintiff's and other Class members' right to recover from CEC on the Guarantee. Although the Amendments do not formally strip Plaintiff and the other Class Members of their right to sue for non-payment of principal and interest, they purposefully render that right worthless. A noteholder who chooses to sue for payment at the date of maturity will no longer, as a practical matter, be able to seek recourse from CEOC, which today is highly leveraged and insolvent, or CEC, the solvent but now discharged guarantor. Thus, the elimination of the Guarantee constitutes an impairment of Plaintiff's right to receive payment and interest on the 2016 Notes in violation of Sections 508, 902 and 905 of the 2016 Notes Indenture, as well as Section 316(b) of the TIA.

**CEC and CEOC have Consummated a Number**
**of Transactions to Strip Assets From CEOC, and**
**Leave CEOC With An Unsustainable Debt Load**
**as Part of a Planned Insolvency**

38.     On January 28, 2008, affiliates of Apollo and TPG acquired CEC in a transaction valued at $30.7 billion, including the assumption of $12.4 billion of debt. The $12.4 billion of assumed debt includes the 2016 Notes and the 2017 Notes. Since the acquisition, Caesars' long-term debt has more than doubled to $25.3 billion of long-term debt, approximately $18 billion of which was issued and is owed by CEOC.

39.     Caesars has faced financial troubles since Apollo and TPG acquired it, and has not posted a profit since late 2009. CEOC's Las Vegas and New Orleans casinos have recovered from the post-2008 economic downturn, but CEOC's regional casinos have not done so.

40.     In 2010, CEC began transferring some of CEOC's most valuable assets from the reach of its creditors to affiliates of CEC. In August 2010, CEOC's trademarks were transferred to CEC subsidiaries not obligated for CEOC's debt. CEOC appears to have received no consideration for these transfers.

41.     In 2011, CEOC transferred its interactive gaming operations to CEC for little or no consideration. CEC ascribed value to these same assets in 2013 totaling $779 million.

42.     In September 2013, CEC caused CEOC to transfer two significant Las Vegas properties to Resort Properties, a wholly owned subsidiary of CEC, for (i) $69 million principal amount of CEOC indebtedness (with a then market value of such securities of $59 million), (ii) $81 million in cash, and (iii) assumption of certain indebtedness, including a $450 million Linq/Octavius Term Loan. The properties transferred included Project Linq, a new shopping, dining and entertainment district, and Octavius Tower, a luxury tower that is a part of the Caesars Palace complex in Las Vegas.

43.     In October, 2013, in connection with the formation of Growth Partners, CEOC transferred to Growth Partners (i) Planet Hollywood in Las Vegas, (ii) a new casino project in Baltimore, Maryland, and (iii) 50% of the management fees payable to CEOC from those properties, for $360 million in cash (funded by cash received from Apollo/TPG) and assumed (i) $510 million Planet Hollywood Loan, and (ii) $330 million Baltimore credit facility. Growth Partners, an entity controlled by Apollo and TPG, is 58% owned by CEC, and 42% owned by Apollo, TPG, and other public shareholders of CEC.

44. In March 2014, CEC caused CEOC to enter into an agreement that required CEOC to sell four of its most important properties to Growth Partners, including Bally's Las Vegas, The Cromwell, The Quad Resort & Casino and Harrah's New Orleans for $2.2 billion, with $1.8 billion in cash, assumed debt of $185 million and committed capital expenditures of $223 million. The transaction also required CEOC to contribute its most valuable intellectual property assets, the Total Rewards Program, to a subsidiary co-owned with Growth Partners and Resort Properties. According to CEC, Total Rewards "drives performance" of its properties and allows Caesars to generally operate more profitably than its competitors. CEC has represented that its casinos generate one-third more revenue than its competitors because of Total Rewards.

45. Lastly, in May 2014, Caesars employed a guarantee busting strategy to evade its guarantee obligations by selling 5% of CEOC's common equity to a third party. Upon completion of this sale, Caesars announced that "…Caesars Entertainment's guarantee of CEOC's outstanding secured and unsecured notes was automatically released." CEOC Form 8-K dated May 6, 2014. After this transaction closed, CEC proudly pronounced that as a result of the transaction, CEC's contractual guarantee obligations of more than $12 billion of indebtedness owed by CEOC were terminated.

46. Caesars engaged in these transactions with the purpose of creating a "Solvent Caesars," which includes Growth Partners and Resort Properties that own the valuable assets formerly owned by CEOC, and an "Insolvent Caesars," which is CEOC, a debt-laden entity, whose assets consist primarily of regional casinos that are unprofitable or less profitable than those transferred to the Solvent Caesars. CEOC remains solely liable for the majority of the debts incurred in the 2008 Buyout transaction.

47.     The transactions were intended to extract valuable assets from CEOC to enrich CEC (and the sponsor's equity investment therein) at the expense of CEOC and its creditors, including its 2016 Noteholders, such as Plaintiff.  At the time of each of the above transfers, CEOC was insolvent, had unreasonably small capital and was unable to repay its debts.  The transfers were made for inadequate consideration and less than reasonably equivalent value.  The transactions were conducted without a public marketing process to non-insider third parties.

48.     Through the transactions and the 2016 Supplemental Indenture, Caesars has sought to deprive its creditors of the ability to seek recourse against CEC's and CEOC's most valuable assets when CEOC predictably defaults on its debts or seeks protections under the bankruptcy code, which it did voluntarily on January 15, 2015.

**Prospects For Recovery of the Principal Amount
of the 2016 Notes Looks Bleak**

49.     The 2016 Notes are unsecured, and CEOC has approximately $17 billion in secured debt.  In the event of a bankruptcy, Plaintiff and members of the Class will be unlikely to recover anything from CEOC because of its massive amount of secured debt.  CEC is Plaintiff's only foreseeable source of payment of the principal and interest on the 2016 Notes.

50.     At the time of the 2008 Buyout, the 2016 Notes were senior unsecured obligations of CEOC,  and were absolutely and unconditionally guaranteed by CEC.   Holders of the 2016 Notes reasonably expected that the  business and assets of Caesars would be available for the payment of principal and interest on the 2016 Notes as they came due.

51.     In its most recent Form 10-K, CEC admitted that CEOC is plunging further into insolvency, and will likely seek a restructuring;

> We do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings.

Ex. H (CEC Form 10-K, filed March 17, 2014, at 46).

52.    On August 12, 2014, CEOC disclosed that the Agreement with the Preferred Noteholders contemplates a near term restructuring.  In an SEC filing, it stated that the Preferred Noteholders will  "consent or approve a restructuring of the Notes" until the earlier of "the 181st day after the  closing date" or the "occurrence of a 'credit event'" including bankruptcy or failure to pay  CEOC's indebtedness.   *See CEOC* Form 8-K, filed August 12, 2014.

53.    Gary Loveman, chief executive officer and president of CEC, admitted the same in an August 12, 2014 *Financial Times* article:  "We have indicated that the company requires deleveraging and that a restructuring is appropriate.   A bankruptcy is a different thing.   It is one option."

54.    Caesars' scheme to remove assets from CEOC to CEC or other affiliates, coupled with the Amendments repudiating CEC's Guarantee of the debt, will impair Plaintiff's and the other Class members' rights to receive payment on their 2016 Notes and, as a practical matter, eliminate their right bring suit to recover payment upon maturity of the 2016 Notes from a diminished CEOC (an insolvent entity) or from CEC (a discharged guarantor).

55.    Following the filing of the Original Complaint on November 14, 2014, CEOC disclosed:

> *We do not currently expect that our cash flows from operations will be sufficient to repay our indebtedness and we will need to pursue additional debt or equity offerings or seek a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code*. . . .  [W]e estimate, that absent a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code, based on our current operating forecasts and their underlying assumptions, *we will require additional sources of liquidity to fund our operations and obligations beginning during the fourth quarter of 2015*. These factors raise substantial doubt as to our ability to continue as a going concern beyond the fourth quarter of 2015 . . . .

Ex. I (CEOC, Form 10-Q, filed November 14, 2014, at 10 (emphasis added)).

56.     These statements were not new, as CEC had previously stated "[w]e do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings." CEC, Form 10-K filed March 17, 2014, at 46.

57.     On November 19, 2014, CEOC disclosed a now-outdated restructuring proposal (which was superseded by newer proposals), developed in connection with its negotiations with certain first lien creditors. *See* Ex. J (CEOC, Form 8-K, Ex. 99.1, filed November 19, 2014). That proposal would have resulted in a 100% recovery for the senior secured credit facility lenders, a 93.8% recovery for first lien noteholders and "a de minimis amount of equity" for holders of second lien and unsecured bond debt, including Plaintiff. *Id.*

58.     In CEOC's words, "By mid-2014… it became clear that a wholesale restructuring [of the Debtors' balance sheet] was required." Ex. K (CEOC's Memorandum In Support of Chapter 11 Petitions, p. 1). CEOC continued, on January 15, 2015,

> after more than six months of intense, arm's-length negotiations among the Debtors, their Caesars affiliates, and certain of their creditors, the parties have agreed on a comprehensive restructuring that substantially reduces the Debtors' debt, reorganizes their business into a REIT structure to maximize value and creditor recoveries, and secures significant financial and other support from the Debtors' non-Debtor affiliates that is critical to a successful restructuring.

*Id.*

59.     Moreover, on December 19, 2014, CEOC and CEC announced that they had executed a proposed Restructuring Support Agreement (the "RSA"), representing a purported settlement by and between CEC, CEOC and an *ad hoc* group of first lien lenders, but no other party. *See* Ex. L (CEOC Form 8-K dated December 19, 2014). The RSA was subsequently

amended on December 31, 2014 and January 13, 2015. *See* Ex. M (Third Amended & Restated Restructuring Support and Forbearance Agreement, dated January 13, 2015).

60.     The plan of reorganization to be proposed by CEOC in its Chapter 11 Cases is described in a term sheet attached as an exhibit to the RSA, and purports to release the Class Plaintiff's claims against CEC. *See* Ex. N (Restructuring Term Sheet, p. 12) ("The Plan shall provide (subject to completion of the investigation by CEOC's governance committee) that CEC's participation in the Plan through its entry into the RSA and performance of the terms thereunder ... shall be a full and complete settlement under Bankruptcy Rule 9019 of any claims or causes of action, known or unknown, that the Company, its estates ***and third parties have or could have against CEC***,... relating to the Company..." (emphasis added)). During a venue determination hearing in the Bankruptcy Court for the District of Delaware, CEOC defended its venue selection of the Northern District of Illinois on the Seventh Circuit's respective law governing non-consensual third party releases and CEC's requirement that they receive such a release. *See* Ex. O (CEOC's Supplemental Objection to Motion and Renewed Motion of Petitioning Creditors for an order establishing venue, pp. 2, 9); *see also* Ex. P (Excerpts of Delaware Bankruptcy Court Hearing Transcript, Jan. 27, 2015, p.129:8-17 (Mr. David Zott of Kirkland & Ellis for CEOC observing that the deposition testimony CEOC's Chief Executive Officer and Chief Restructuring Officer reflect an understanding that one of the  factors that went into venue determination was the issue of consensual/nonconsensual releases.)).  Moreover, under the RSA, holders of 2016 Notes will receive a *de minimis* recovery on their claims, whether or not they vote to support the plan.

61.     The RSA, as executed by CEC, called for CEOC to commence Chapter 11 cases between January 15, 2015 and January 20, 2015.

62.     In advance of that filing, on January 12, 2015, certain creditors holding Second Lien Notes due 2018 issued by CEOC filed an involuntary bankruptcy petition for relief against CEOC under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. *In re Caesars Entertainment Operating Company, Inc., alleged debtor*, Case No. 15-10047 (Bankr. D. Del.) (Gross, J) (the "Involuntary Bankruptcy"). Plaintiff notified this Court of the Involuntary Bankruptcy, and the resulting automatic stay of the present action against CEOC, in a letter to the Court dated January 13, 2015 [D.I. 19].

63.     On January 15, 2015, CEOC and certain of its affiliates and subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois. *In re Caesars Entertainment Operating Company, Inc., et al.*, Case No. 15-01145 (ABG) (the "Voluntary Bankruptcy").

64.     The filing of the Voluntary Bankruptcy case constituted an immediate Event of Default under the 2016 Notes Indenture, as a result of which all principal and interest is immediately due and owing. 2016 Notes Indenture, §§ 501, 502. As a result of CEOC's voluntary bankruptcy filing, the principal amount of, and accrued and unpaid interest on the 2016 Notes became immediately due and payable without any declaration or other act on the part of the Trustee or any Holder. *See* 2016 Notes Indenture, § 502. However, CEC continues to disclaim its Guarantee of the 2016 Notes, and has not paid what it owes to the Plaintiff.

65.     As set forth fully hereinafter, Caesars's course of conduct has violated the TIA, the 2016 Notes Indenture, the Guarantee and its implied duty of good faith and fair dealing, while CEC's post-acceleration conduct violates the rights of the Plaintiff and the Class under the 2016 Notes Indenture. Thus, Plaintiff and the Class is entitled to the declaratory relief and money damages for which Plaintiff respectfully prays below.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined as: all persons who beneficially held the 2016 Notes during the period August 11, 2014 to the present. Excluded from the Class are the Preferred Noteholders, defendants, other officers and directors of CEOC and CEC at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  CEOC currently owes $159.3 million in principal amount on the 2016 Notes to parties other than Caesars Acquisition Company.  Throughout the Class Period, the 2016 Notes were actively traded.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds of members in the proposed Class.

68.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.     whether CEOC breached certain provisions of the 2016 Notes Indenture;

    b.     whether Caesars' actions violated the TIA; and

    c.     the extent of damages sustained by Class members, and the appropriate measure of damages or declaratory relief.

69.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

70.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE

**Declaratory Judgment that the 2016 Notes Supplemental Indenture is Ineffective, Invalid and Void, and the 2016 Notes Indentures are in Full Force and Effect**

72.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

73.     An actual controversy exists between Plaintiff and Caesars regarding the validity and enforceability of the 2016 Notes Supplemental Indenture, and a declaration of rights under the 2016 Notes Indenture is necessary and appropriate to establish that Plaintiff and the Class are not bound by the Amendments and that the 2016 Notes Indenture, including the Guarantee and Covenant Against Fundamental Changes, remains in full force and effect as between CEOC and CEC, and Plaintiff and the Class.

74.     Caesars was prohibited from modifying, except by unanimous vote of all 2016 Noteholders other than CEC and/or affiliated entities, Plaintiff's absolute right to receive principal and interest on the 2016 Notes and his right to institute suit for the enforcement of such payment, pursuant to 2016 Notes Indenture Sections 508 and 902, and §316(b) of the TIA. The Amendments and 2016 Notes Supplemental Indenture have modified Plaintiff's right to receive payment to institute suit for the enforcement of such payment on the 2016 Notes.

75.     The Guarantee cannot be removed from the 2016 Notes Indenture because:

a. CEC's obligations under the Guarantee and the provisions of the 2016 Notes Indenture are "unconditional, irrespective of . . . any waiver or consent by any Holder . . ." (2016 Notes Indenture, § 1501(1);

b. CEOC is a wholly owned subsidiary of CEC under Rule 1-02(z) of the Regulation S-X promulgated by the SEC; thus CEOC's attempt to disclaim the Guarantees under Article XV of the 2016 Notes Indenture is without force and effect;

c. Even if CEOC were not a wholly owned subsidiary of CEC under Rule 1-02(z), based solely on CEC's equity ownership of CEOC, the transactions by which CEC transferred equity in CEOC to others was part of a scheme to circumvent the rights of the holders of the 2016 Notes in violation of the TIA and the 2016 Notes Indenture;

d. At the times the Preferred Noteholders consented to the 2016 Notes Supplemental Indenture, Caesars did not even have a true majority vote because CEOC and CEC controlled or shared control over the power to vote the Preferred Noteholders' 2016 Notes pursuant to the Agreement, and also controlled or shared control over the power to sell the 2016 Notes subject to the Agreement and, as a result, Caesars had beneficial ownership of the 2016 Notes at the times the purported consents were granted, thus, the voting of those 2016 Notes constituted "Affiliate" voting and their votes should not have been counted pursuant to Section 101 of the 2016 Notes Indenture, as well as Section 316(a) of the TIA, for purposes of

determining whether the Holders had consented to the Amendments and 2016 Notes Supplemental Indenture;

e. the Amendments were effectuated without Plaintiff's and the Class' consent in violation of the Sections 508 and 902 of the 2016 Notes Indenture, and the TIA, 15 U.S.C. §§77aaa, *et seq.*, and pursuant to a course of dealing by Caesars that constituted bad faith.

76. Accordingly, Plaintiff requests a declaration, pursuant to N.Y. C.P.L.R. §3001, that (i) the 2016 Notes Supplemental Indenture is null and void, ineffective and invalid, and (ii) the original Indenture, including Article XV of the 2016 Notes Indenture, and the Covenant Against Fundamental Changes, has not been released and remain valid, binding and enforceable against CEOC and CEC.

## COUNT TWO

### Violations of the Trust Indenture Act, 15 U.S.C. §§77aaa, *et seq.*

77. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

78. The 2016 Notes are debt securities qualified under the TIA, which regulates debt securities.

79. Section 316(b) of the TIA, 15 U.S.C. §777ppp(b), requires that Plaintiff and other noteholders' right to receive payment of principal and interest on a debt security on or after their respective due dates expressed in the 2016 Notes Indenture shall not be impaired or affected without the consent of each holder. Section 316(b) further provides that Plaintiff's and other noteholders' right to institute suit to enforce such payment, may not be impaired by the 2016 Notes Indenture, without the consent of each holder.

80.     In addition, the Agreement and Amendments were a part of Caesars' strategy to restructure CEOC's debt at the expense of CEOC's noteholders, and underscore the damage Plaintiff will continue to suffer as a result of the transfer of valuable assets from CEOC to other entities, foreshadowing an impending bankruptcy and restructuring.

81.     Caesars has thus violated Section 316(b) of the TIA.

82.     Accordingly, Plaintiff and the Class are entitled to the declaratory relief pleaded in Count One.

83.     In addition, as a result of Caesars' violation of the TIA, Plaintiff and the Class has suffered actual and prospective damages in an amount to be determined at trial.

## COUNT THREE

**Breach of Contract, 2016 Notes Indenture, Sections 508 and 902**

84.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

85.     The 2016 Notes Indenture was at all relevant times a valid and enforceable contract.

86.     Section 508 of the 2016 Notes Indenture promised Plaintiff and members of the Class the unconditional right to receive principal and interest payments from Caesars without the consent of each holder.

87.     Section 902(4) of the 2016 Notes Indenture prohibited Caesars from entering into a supplemental indenture that modified Section 508 – the unconditional right to receive principal and interest payments without the consent of each noteholder – by the written consent of the holders of a majority in principal amount of the outstanding 2016 Notes.

88.     The Amendments and 2016 Notes Supplemental Indenture are part of a larger scheme by Caesars to restructure CEOC's debt and transfer out of CEOC and away from

creditors CEOC's most valuable assets in the face of an impending bankruptcy. Taken together, Caesars has thus effectively eliminated Plaintiff's and the other Class Members' ability to recover the value of their investments.

89.     By entering into the 2016 Notes Supplemental Indenture, Caesars has breached the 2016 Notes Indenture and has impaired the rights of Plaintiff and the Class to payment under the 2016 Notes and to institute suit for the enforcement of such payment, without each holder's consent.

90.     Accordingly, Plaintiff and the Class are entitled to the declaratory relief sought in Count One.

91.     In addition, as a result of Caesars' breach of the 2016 Notes Indenture, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

## COUNT FOUR

### Breach of Contract, 2016 Notes Indenture, Section 1103

92.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

93.     The 2016 Notes Indenture was at all relevant times a valid and enforceable contract.

94.     The Indenture requires the Trustee to treat all noteholders fairly and appropriately. Section 1103 of the 2016 Notes Indenture requires that the Trustee select the 2016 Notes to be redeemed in a manner that is fair and appropriate, should less than all the Notes be redeemed.

95.     Under the Agreement, CEOC and CEC purchased a portion of the 2016 Notes held by the Preferred Noteholders at par plus accrued interest.   At closing, the Agreement required that (i) CEC transfer to CEOC for cancellation the 2016 Notes that it purchased from the Preferred Noteholders, and (ii) CEOC direct the Trustee to cancel the 2016 Notes that it

purchased from the Preferred Noteholders.  *See* Agreement, §2.2(e).  As a result of these provisions, the Agreement, in substance, amounted to the redemption of a portion, but not all, of the 2016 Notes.  Therefore, the 2016 Notes Indenture imposed obligations upon the Trustee to select the 2016 Notes to be redeemed in a manner that is fair and appropriate.

96.     By entering into the 2016 Notes Supplemental Indenture, and completing the transactions contemplated by the Agreement, Section 1103 of the 2016 Notes Indenture was violated.

97.     Accordingly, Plaintiff and the Class are entitled to the declaratory relief sought in Count One.

98.     In addition, as a result of Caesars' breach of the 2016 Notes Indenture, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

<u>**COUNT FIVE**</u>

**Breach of Duty of Good Faith and Fair Dealing**

99.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

100.    The 2016 Notes Indenture was at all relevant times a valid and enforceable contract.

101.    Contracts governed by New York law include an implied covenant requiring each party to deal fairly and in good faith with the other.  Further, New York law protects the benefit of the bargain by requiring parties to refrain from taking any actions that would deprive the other party of the benefit of that bargain.

102.    Caesars engaged in conduct falling outside the performance of the 2016 Notes Indenture, such as the Agreement and the 2016 Notes Supplemental Indenture adopting the Amendments, each of which attempt to do what the plain language of the 2016 Notes Indenture,

and the TIA preclude, namely the removal of the Guarantee without the consent of all 2016 Noteholders.

103. Specifically, Caesars violated the implied covenant of good faith and fair dealing by the following:

a. By entering into the Agreement with the Preferred Noteholders to purchase certain of their 2016 Notes at par plus accrued interest, on the condition that they vote all 2016 Notes to approve the Amendments, without offering to repurchase all 2016 Notes, thus impermissibly binding and disenfranchising the remaining noteholders;

b. By attempting to disclaim its guarantee under Article XV of the 2016 Notes Indenture, even though CEOC remains a wholly owned subsidiary under Rule 1-02(aa) of Regulation S-X and the 2016 Notes Indenture and, even if CEOC were not a wholly owned subsidiary of CEC under Rule 1-02(z) based solely on CEC's May 2014 sale of at least 5% of CEOC's equity ownership, the sale of such equity was part of a scheme to deprive the 2016 Noteholders of the protections of the TIA, and the covenant of good faith and fair dealing;

c. By removing the Covenants Against Fundamental Changes in Section 801 of the 2016 Notes Indenture, through the consent of only the Preferred Noteholders, Caesars removed restrictions that would prevent Caesars from transferring valuable assets from CEOC to other CEC entities and their affiliates, in order to insulate Solvent Caesars from the debts of Insolvent Caesars;

d.     By structuring the transaction so as to thwart the Trustee's obligation to select shares for redemption using a "fair and appropriate" process; and

e.     By thwarting the Indenture's prohibition on bondholder conduct that affects, disturbs or prejudices the rights of any other bondholders, and prevents bondholders from obtaining a priority or preference over any other bondholder.

104.    Caesars course of conduct violated the implied covenant of good faith and fair dealing and public policy because:

a.     Caesars disregarded Section 902 of the 2016 Notes Indenture, by electing to present the Amendment to only the Preferred Noteholders rather than to all 2016 Noteholders, without making the same compensation equally and ratably available to all 2016 Noteholders;

b.     The Preferred Noteholders' vote on the Amendments was mere empty voting, because the Preferred Noteholders did not have an economic interest in the notes repurchased since such 2016 Notes were repurchased at par plus interest;

c.     Caesars directed the voting of the Preferred Noteholders' 2016 Notes, even though Caesars would have been unable to vote the 2016 Notes directly under the 2016 Notes Indenture; and

d.     Plaintiff was disenfranchised because Caesars simply "bought" the consent of the Preferred Noteholders without offering to purchase all 2016 Noteholders' notes, rendering bondholder consent under the 2016 Notes Indenture illusory.

105. Caesars' course of conduct, and blatant attempts to deny 2016 Noteholders the protections of the 2016 Notes Indenture and the TIA constitutes bad faith and deprived Plaintiff of the benefit of its bargain under the 2016 Notes Indenture.

106. Further, at the time that the 2016 Notes were issued, no reasonable person would have anticipated Caesars' course of conduct. If it had been disclosed that a simple majority would, in secret, negotiate a private payout in return for amending the 2016 Notes Indenture to lay waste to the protections afforded to each and every 2016 Noteholder, no reasonable person would have entered into the contract.

107. Accordingly, Plaintiff and the Class are entitled to the declaratory relief sought in Count One.

108. In addition, as a result of Caesars' breach of the 2016 Notes Indenture, Plaintiff and the Class have suffered damages in an amount to be determined at trial.

## COUNT SIX

**(Breach of Contract (2016 Notes Indenture §§ 501(5)(a) and 502) and Breach of Guarantees as to CEC)**

109. Plaintiff incorporates by reference Paragraphs 1 through 109 of the Amended Complaint as if set forth fully herein.

110. The terms of the 2016 Notes, the 2016 Notes Indenture and the Guarantee were at all times herein valid and enforceable contract obligations of CEC.

111. CEOC's commencement of a voluntary bankruptcy case constituted an Event of Default under Section 501(5)(a) of the 2016 Notes Indenture. As a result of this Event of Default, all amounts due under the 2016 Notes, the Guarantee and the 2016 Notes Indenture have become immediately due and payable, including all outstanding principal and accrued, unpaid and

capitalized interest. *See* Ex. A (2016 Notes Indenture, Article XV) and Ex. Q (Notation of Guarantee).

112.     Pursuant to the 2016 Notes, 2016 Notes Indenture and the Guarantee, CEC unconditionally guaranteed CEOC's obligations under the Notes and is now liable to Plaintiff and the Class for all amounts due thereunder, including all outstanding principal and accrued, unpaid, and capitalized interest.

113.     CEC has breached its obligations to Plaintiff and the Class under the terms of the 2016 Notes, 2016 Notes Indenture and the Guarantee by failing to pay Plaintiff and the Class all amounts due thereunder, including all outstanding principal and accrued, unpaid, and capitalized interest due on the 2016 Notes.

114.     As a result of CEC's breach, Plaintiff and the Class have suffered substantial actual and prospective damages in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued, unpaid and capitalized interest on the 2016 Notes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the Class the declaratory relief requested herein;

C.     Awarding Plaintiff and the Class damages, in an amount to be determined at trial, but not less than an amount equal to the principal of and accrued, unpaid and capitalized interest on their Notes, including pre- and post-judgment interest calculated pursuant to the terms of the 2016 Notes, 2016 Notes Indenture, and Guarantee;

D.     Awarding Plaintiff reasonable costs and attorneys' fees; and

E.     Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court

may deem just and proper.

**JURY DEMAND**

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury.

Dated: February 4, 2015

<div style="margin-left: 40%">

**GARDY & NOTIS, LLP**

By: */s/ Meagan Farmer*
Mark C. Gardy
James S. Notis
Meagan Farmer
Tower 56
126 East 56th Street, 8th Floor
New York, New York 10022
Tel:  212-905-0509
Fax:  212-905-0508


**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Gordon Z. Novod
Elizabeth Shofner
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel:  646-722-8500
Fax:  646-722-8501
*Attorneys for Plaintiff*

</div>