## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEEHANCOMBS GLOBAL CREDIT OPPORTUNITIES MASTER FUND, LP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CAESARS ENTERTAINMENT CORP. and CAESARS ENTERTAINMENT OPERATING CO., INC., <br><br> Defendants. | No. 1:14-cv-07091-SAS |
| FREDERICK BARTON DANNER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CAESARS ENTERTAINMENT CORP. and CAESARS ENTERTAINMENT OPERATING CO., INC., <br><br> Defendants. | No. 1:14-cv-07973-SAS <br><br> Oral Argument Requested |

## MEMORANDUM OF LAW OF CAESARS ENTERTAINMENT CORPORATION IN OPPOSITION TO PLAINTIFFS' <u>MOTIONS FOR PARTIAL SUMMARY JUDGMENT</u>

FRIEDMAN KAPLAN
SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Fax: (212) 833-1250

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 492-0020

*Attorneys for Caesars Entertainment Corporation*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................. 4

    I.      CEC and CEOC ............................................................................... 4

    II.    The Indenture and the Guarantee ................................................... 4

    III.   The Challenged Transactions ........................................................... 6

         A.      The 5% Stock Sale ................................................................ 6

         B.      The 6% Stock Transfer ......................................................... 7

         C.      The August Transaction ....................................................... 7

    IV.   The Relationship Between CEC and CEOC Following the May Transactions ............ 8

    V.    The Restructuring Support Agreement and CEOC's Bankruptcy ................. 9

ARGUMENT ................................................................................................ 9

    I.      Plaintiffs Fail to Demonstrate that the Guarantee
           Remained in Place Following the May Transactions ................................... 9

         A.      Section 508 of the Indenture Does Not
                 Preclude Termination of the Guarantee ........................................ 10

         B.      Whether CEOC Was "Wholly Owned" By CEC Following the May
                 Transactions Cannot be Resolved on Summary Judgment ...................... 12

         C.      CEC Is Not Precluded from Asserting that
                 the May Transactions Released the Guarantee ................................ 17

    II.    Plaintiffs Fail to Show that the August Transaction Violated the TIA ............ 21

         A.      The Guarantee Was Not a "Core Term" of the Indenture ...................... 22

         B.      The Undisputed Facts Do Not Show an
                 "Out-of-Court Debt Reorganization" Under This Court's Decisions ............ 24

         C.      The Guarantee Is Not a "Security" Under the TIA ........................... 26

         D.      Plaintiffs Fail to Demonstrate Any
                 Actual Damages Resulting from the August Transaction ...................... 29

    III.   Plaintiffs Fail to Show that the August Transaction Violated the Indenture ............ 30

IV.     Summary Judgment on Plaintiffs' Declaratory Judgment Claims is Inappropriate ... 31

CONCLUSION ..................................................................................................................... 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Tissue, Inc.* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004)...................................................20

*Ancile Inv. Co.* v. *Archer Daniels Midland Co.*,
  No. 08 Civ. 9492 (KMW), 2011 WL 3516128 (S.D.N.Y. Aug. 3, 2011) .............................20

*Bank of New York* v. *First Millennium, Inc.*,
  607 F.3d 905 (2d Cir. 2010)......................................................11

*Beardslee* v. *Inflection Energy, LLC*,
  25 N.Y.3d 150 (N.Y. 2015)........................................................11

*BOKF, N.A.* v. *Caesars Entm't Corp.*,
  No. 15 Civ. 1561 (SAS), 2015 WL 5076785 (S.D.N.Y. Aug. 27, 2015) ...................... *passim*

*Caldor, Inc.* v. *Mattel, Inc.*,
  817 F. Supp. 408 (S.D.N.Y. 1993) ................................................13

*Cisneros* v. *Alpine Ridge Grp.*,
  508 U.S. 10 (1993)...............................................................12

*Coan* v. *Bell Atl. Sys. Leasing Int'l, Inc.*,
  813 F. Supp. 929 (D. Conn. 1990).................................................28

*County of Suffolk* v. *Alcorn*,
  266 F.3d 131 (2d Cir. 2001).......................................................30

*Federated Strategic Income Fund* v. *Mechala Grp. Jamaica Ltd.*,
  No. 99 Civ. 10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999)..................23

*Fund of Funds, Ltd* v. *Arthur Andersen & Co.*,
  No. 75 Civ. 540 (CES), 1980 WL 1146 (S.D.N.Y. Dec. 18, 1980)......................29

*Gibson* v. *City of Kirkland*,
  433 F. App'x 539 (9th Cir. 2011) .................................................30

*Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.*,
  198 F.3d 685 (8th Cir. 1999) .....................................................28

*Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*,
  No. 04 Civ. 7643 (HB), 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005)....................11

*Haberman* v. *Washington Pub. Power Supply Sys.*,
  744 P.2d 1032 (Wash. 1987), *amended*, 750 P.2d 254 (Wash. 1988) ...................................28

*Hinshaw* v. *M-C-M Props., LLC*,
  450 S.W.3d 823 (Mo. Ct. App. 2014).................................................................................30

*Hoyt* v. *Andreucci*,
  433 F.3d 320 (2d Cir. 2006).................................................................................................12

*LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005).................................................................................................10

*Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*,
  75 F. Supp. 3d 592 (S.D.N.Y. 2014).............................................................................2, 22, 25

*Mariah Re Ltd.* v. *Am. Family Mut. Ins. Co.*,
  52 F. Supp. 3d 601 (S.D.N.Y. 2014), *aff'd*, 607 F. App'x 123 (2d Cir. 2015).....................32

*MeehanCombs Global Credit Opps. Funds, LP* v. *Caesars Entm't Corp.*,
  80 F. Supp. 3d 507 (S.D.N.Y. 2015)...................................................................................23

*Mitchell* v. *Washingtonville Cent. Sch. Dist.*,
  190 F.3d 1 (2d Cir. 1999)...................................................................................................20

*Morse/Diesel, Inc.* v. *Trinity Indus., Inc.*,
  67 F.3d 435 (2d Cir. 1995).................................................................................................12

*In re Nantucket Island Assoc. Ltd. P'ship Unitholders Litig.*,
  810 A.2d 351 (Del. Ch. 2002).............................................................................................12

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA.* v. *Int'l Wire Grp., Inc.*,
  No. 02 Civ. 10338 (SAS), 2003 WL 21277114 (S.D.N.Y. June 2, 2003)..............................32

*Neonex Int'l Ltd.* v. *Norris Grain Co.*,
  338 F. Supp. 845 (S.D.N.Y. 1972) ......................................................................................13

*Philips Lighting Co.* v. *Schneider*,
  No. 05 Civ. 4820 (SLT), 2008 WL 4527713 (E.D.N.Y. Sept. 30, 2008)...............................11

*Republic of Ecuador* v. *Chevron Corp.*,
  638 F.3d 384 (2d Cir. 2011).................................................................................................20

*Reves* v. *Ernst & Young*,
  494 U.S. 56 (1990)..........................................................................................................27, 28

*Royal Park Invs. SA/NV* v. *HSBC Bank USA, Nat. Ass'n*,
  No. 14 Civ. 10101 (SAS), 2015 WL 3466121 (S.D.N.Y. June 1, 2015)...........................3, 29

*Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*,
  88 F.R.D. 38 (S.D.N.Y. 1980) ...................................................................13

*Thompson* v. *Gjivoje*,
  896 F.2d 716 (2d Cir. 1990)......................................................................12

*TR 39th St. Land Corp.* v. *Salsa Distribution USA, LLC*,
  No. 11 Civ. 7193 (DF), 2015 WL 1499173 (S.D.N.Y. Mar. 25, 2015)..................20

*Union Ins. Soc. of Canton, Ltd.* v. *William Gluckin & Co.*,
  353 F.2d 946 (2d Cir. 1965)......................................................................13

*United Hous. Found., Inc.* v. *Forman*,
  421 U.S. 837 (1975).................................................................................27

*United States* v. *Vahlco Corp.*,
  800 F.2d 462 (5th Cir. 1986) ....................................................................11

*Western Heritage Ins. Co.* v. *Century Sur. Co.*,
  32 F. Supp. 3d 443 (S.D.N.Y. 2014)...........................................................9

*Winston* v. *Mandor*,
  710 A.2d 835 (Del. Ch. 1997)....................................................................13

*Woods* v. *Homes & Structures of Pittsburg, Kansas, Inc.*,
  489 F. Supp. 1270 (D. Kan. 1980) ........................................................28, 29


**Statutes**

15 U.S.C. § 77www(b) .................................................................................29

15 U.S.C. § 77ccc ......................................................................................27

15 U.S.C. § 77ppp(b) .............................................................................*passim*

28 U.S.C. § 2201.......................................................................................32


**Other Authorities**

17 C.F.R. § 210.1-02(aa) ...........................................................................1, 5

74 Fed. Reg. 27427 ...............................................................................14, 17

George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431 (2006)......................................22

John C. Coffee, Jr. & William A. Klein, *Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations*, 58 U. Chi. L. Rev. 1207 (1991) ................................................................................................22

Jonathan C. Lipson, *Governance in the Breach: Controlling Creditor Opportunism*, 84 S. Cal. L. Rev. 1035 (2011) ........................................................................22

## PRELIMINARY STATEMENT

Plaintiffs' Motions focus on an August 2014 transaction (the "August Transaction") that, by agreement with holders of a majority of the Notes not held by Caesars Entertainment Corporation ("CEC"), amended the 2016 Indenture to remove CEC's guarantee of the Notes.  But Plaintiffs can prevail only if they show, on the undisputed facts, both that the August Transaction was invalid, and that two earlier transactions in May, by which CEC's ownership of Caesars Entertainment Operating Company ("CEOC") was reduced to 89% (the "May Transactions"), also did not eliminate the guarantee.  Plaintiffs fail to make either showing.

*First*, Plaintiffs cannot establish that CEC's guarantee survived the May Transactions.  Under the Indenture, CEC's guarantee is released if "for any reason" CEOC ceases to be a "wholly owned subsidiary" of CEC.  (Indenture § 1503(3).)  Plaintiffs do not contend on these Motions that a release under that provision would violate the Trust Indenture Act ("TIA").  Instead, MeehanCombs contends that the guarantee can *never* be released because of a reference in the Indenture to an "absolute and unconditional" right to payment.  But this argument finds no support in the law, and would eviscerate the Indenture's detailed provisions authorizing the guarantee to be terminated.  As the Court recognized in *BOKF*, that a guarantee is unconditional while in force does not mean that it can never be terminated.  Were it otherwise, there would have been no reason for the detailed language in the Indenture spelling out the circumstances for terminating CEC's guarantee.

Similarly without merit is MeehanCombs's contention that, even after the May Transactions, CEOC is still a "wholly owned" subsidiary of CEC as that term is defined in the Indenture.  The Indenture defines "wholly owned subsidiary" by reference to an SEC regulation that, in turn, defines it as a subsidiary "substantially all of whose outstanding voting shares are

owned by its parent," 17 C.F.R. § 210.1-02(aa), but MeehanCombs advances no support for the proposition that in the circumstances here CEC's 89% ownership constitutes "substantially all" of CEOC's stock.   MeehanCombs's reliance on irrelevant and now defunct accounting pronouncements about "push-down accounting"—a topic that has nothing to do with debt guarantees—is misplaced.   And these pronouncements, to the extent relevant at all, only underscore that whether or not CEOC remains a wholly owned subsidiary of CEC is an issue of fact, based on a host of considerations, that cannot be resolved on summary judgment.

Plaintiffs' argument that CEC is bound by purported "admissions" that the May Transactions did not terminate the guarantee under the Indenture ignores CEC's longstanding, repeated, public, and consistent statements directly to the contrary, mischaracterizes the statements by CEC upon which Plaintiffs rely, and finds no support in the law.

*Second*, Plaintiffs fail to show that the August Transaction violated TIA Section 316(b).  This Court has held that to prove an impairment under Section 316(b), Plaintiffs must prove either (i) an amendment to a "core term" of the debt instrument, or (ii) an "out-of-court debt reorganization."  *BOKF, N.A.* v. *Caesars Entm't Corp.* ("*BOKF*"), No. 15 Civ. 1561 (SAS), 2015 WL 5076785, at *5 (S.D.N.Y. Aug. 27, 2015).  No court—including this one—has ever held that a guarantee is a "core term," and any such conclusion would effectively "condemn widespread market practice" under which guarantees can be released by majority noteholder vote.  *Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.* ("*Marblegate I*"), 75 F. Supp. 3d 592, 612 n.14 (S.D.N.Y. 2014).  Such a result is particularly inappropriate here, where the terms of the Indenture itself show that the guarantee was not an essential aspect of the noteholders' investment.

Plaintiffs likewise cannot show that the August Transaction constituted or was part of an "out-of-court debt reorganization."  In *BOKF*, this Court held that whether the May and August Transactions constituted an out-of-court reorganization "either individually or collectively" is a disputed issue of fact not amenable to summary judgment, and Plaintiffs offer no basis to revisit that holding.  2015 WL 5076785, at *11.  MeehanCombs's alternative contention that the guarantee was in and of itself a security under the TIA finds no support in the statute, has never been endorsed by any court, is inconsistent with *Marblegate*, and would disrupt established market practice.  As the Indenture and the other evidence in the record make clear, the guarantee was no more than a contingent contract right of noteholders, subject to termination under the Indenture, not an independently tradeable "security."

Plaintiffs' Motions also ignore that, aside from liability, there are triable issues of fact concerning the existence of damages.  As this Court held only this year, the TIA limits their recovery to out of pocket damages.  *Royal Park Invs. SA/NV* v. *HSBC Bank USA, Nat. Ass'n*, No. 14 Civ. 10101 (SAS), 2015 WL 3466121, at *5 (S.D.N.Y. June 1, 2015).  But Plaintiffs make no effort to show that they have suffered any monetary harm.

*Third*, Plaintiffs fail to show that the August Transaction violated the Indenture. In particular, MeehanCombs's contention that the guarantee was a standalone "Security" under the Indenture, and that the Indenture thereby prohibited an amendment removing the guarantee, is unsupported by any plausible reading of the Indenture.

*Finally*, summary judgment on Plaintiffs' claims for declaratory judgment should be denied for the independent reason that they are duplicative of Plaintiffs' other claims for relief and do not clarify the parties' prospective rights and obligations.

## STATEMENT OF FACTS

I.     **CEC and CEOC**

CEC and its subsidiaries, including CEOC, own, operate, or manage approximately 50 casinos in 14 U.S. states and five countries. (Sambur Decl. ¶ 3.) On January 15, 2015, CEOC filed for bankruptcy under Chapter 11 of the Bankruptcy Code. (*Id*.)

As discussed in CEC's opposition to the motions for partial summary judgment in the *BOKF* and *UMB* cases, CEOC's bankruptcy stemmed from economic factors and industry trends unforeseen in 2008, when CEC was taken private in a leveraged buyout. Opp. to BOKF MSJ at 7-8 (Jul. 24, 2015) [*BOKF* Dkt. No. 44]. In response to these events, CEC, CEOC, and their affiliates engaged in dozens of capital market transactions that positioned CEOC for an improved business environment and enabled it to repay more than $8 billion to its creditors. Contrary to Plaintiffs' allegations that certain of these transactions "stripped" CEOC of valuable assets at unfair prices, the transactions were the result of a good faith and appropriate process, provided CEOC with fair market value for the assets it sold as attested by independent financial advisors, and funded CEOC with billions of dollars in cash. (Sambur Decl. ¶¶ 4-17.)

II.     **The Indenture and the Guarantee**

Plaintiffs hold unsecured 2016 CEOC Notes, which are governed by an Indenture that sets forth in detail the rights and obligations of CEOC, CEC, the Trustee, and the noteholders, including those relating to CEC's guarantee (the "Guarantee").

Although the Indenture characterizes the Guarantee as "unconditional," it makes clear that the Guarantee may be terminated. Section 1503—entitled "Release of Guarantor"— expressly provides that CEC may be "released from all of its obligations under the Guarantee," and sets forth in detail a series of independent mechanisms under which that can occur. In particular, Section 1503 provides that the Guarantee is released upon:  (1) CEC or CEOC's

4

transfer of all or substantially all of its assets to another entity, provided that the transferee assumes the obligations under the Guarantee; (2) CEC's liquidation, provided that if any other entities acquire all or substantially all of CEC's assets, they assume the obligations under the Guarantee; or (3) CEOC ceasing "for any reason" to be a "wholly owned subsidiary" of CEC, as defined in SEC Regulation S-X.  Regulation S-X defines a "wholly owned subsidiary" as "a subsidiary substantially all of whose outstanding voting shares are owned by its parent and/or the parent's other wholly owned subsidiaries."  17 C.F.R. § 210.1-02(aa).  Unlike the plaintiffs in *BOKF* and *UMB*, Plaintiffs do not argue that the conditions set forth in Section 1503(3) should be read conjunctively such that the Guarantee can be released only if all three conditions apply.

As these and other provisions of the Indenture and the Notes Prospectus make clear, the Guarantee is not an essential economic term of the Notes.  As noted, CEC and CEOC are permitted to take unilateral actions that would terminate the Guarantee.  And nothing in the Indenture restricts CEC's ability to incur additional debt, grant liens, sell assets, or even declare bankruptcy, as would be expected if investors were intended to rely on CEC's credit to assure repayment.  By contrast, at the time CEOC issued the Notes, other issuers of debt subject to the TIA included parent guarantees in their indentures containing far more onerous parent-level obligations, including very limited mechanisms for release of the guarantee, material "cross-default provisions" applicable to the parent, including upon a bankruptcy filing, and extensive parent-level restrictive covenants.  (Gadsden Decl. ¶ 13.)  The Prospectus for the Notes disclosed that the Guarantee could be released, including if CEOC ceased to be CEC's wholly owned subsidiary, and cautioned investors that CEC "[did] not own any material assets other than the common stock of [CEOC]" and was therefore "dependent on the receipt of dividends or other payments from [CEOC] to make payments on the guarantee."  (Hurwitz Decl. Ex. A at 8.)

Likewise, nothing in the Indenture prohibits an amendment by a majority of holders to remove the Guarantee. Section 902 provides that CEC, CEOC, and the Trustee may supplement the Indenture by agreement with holders of a majority of the Notes "for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture." Section 902(1), on which Plaintiffs rely, prohibits amendments without the consent of all holders that would change the maturity date of payments, reduce principal or interest, or "impair the right to institute suit for the enforcement" of payment after maturity, but says nothing about the Guarantee.

### III.   The Challenged Transactions

The Motions challenge three transactions, undertaken respectively in May and August 2014, each of which was sufficient independently to terminate the Guarantee by the terms of the Indenture. These transactions provided substantial benefits to CEOC and its creditors, including more than $2 billion in cash and debt relief, and were undertaken as part of a broader, sustained effort over many years to improve its financial condition. (Sambur Decl. ¶ 8.)

### A.   The 5% Stock Sale

On May 6, 2014, CEC and CEOC announced a transaction (the "B-7 Transaction") designed to repay CEOC's near-term maturities. (*Id*. ¶ 10.) Under the B-7 Transaction, CEOC obtained $1.75 billion of new term loans, which were used to repay, among other things, nearly all outstanding notes that were set to mature before 2016. (*Id.*) As a condition of the new financing, the lenders demanded that CEC exercise its right under various indentures—including the Indenture at issue here—to release CEC's parent guarantee, and CEC and CEOC assented to the lenders' conditions. (*Id.* ¶ 12.)

Accordingly, on May 5, 2014, CEC sold 5% of CEOC's stock to three investors for a total of $6.15 million (the "5% Stock Sale"). (*Id.* ¶ 13.) As a matter of standard practice

for such transactions, the investors were indemnified for any potential related litigation. (Hurwitz Decl. Ex. B (Dhingra Dep.) at 116:8-15; Ex. C (Wallach Dep.) at 75:16-76:19, 78:5-18.)  The sale followed arm's-length negotiations over the price, with the transaction completed at a figure between the parties' initial positions.  (Hurwitz Decl. Ex. C (Wallach Dep.) at 114:20-116:8.)  One of the purchasers testified that the company made the investment largely because "there was a chance that [the stock] could be worth a lot."  (*Id.* at 61:4-20, 154:6-18.)  Another testified that it purchased the shares based on CEOC's attractive financial characteristics and the potential positive return.  (Hurwitz Decl. Ex. D (Roselli Dep.) at 69:4-13, 70:25-71:18.)  While that investor agreed to sell other CEOC notes (due to mature in 2015) back to the company at approximately the same time that the 5% Stock Sale occurred, CEOC's obligation to purchase the notes was contingent on the closing of the B-7 Transaction, and the price for those notes was equivalent to those offered to all noteholders in a tender offer based on the redemption price established by the Indenture.  Indeed, as noted, the repurchase of CEOC's notes due in 2015 was a primary purpose of the B-7 Transaction.  (Sambur Decl. ¶¶ 10, 14.)

**B.    The 6% Stock Transfer**

Separately, on May 30, 2014, CEOC executed a transaction (the "6% Stock Transfer") in which it transferred approximately 6% of its stock to an employee benefit plan for distribution to 377 Caesars employees, which reduced CEC's ownership to 89% of CEOC.  (*Id.* ¶ 15.)  The transfer facilitated the creation of CEOC equity that could be used in future deleveraging transactions.  (*Id.*)

**C.    The August Transaction**

On August 12, 2014, CEOC, CEC, and certain noteholders (the "Participating Noteholders") representing a majority of the 2016 Notes and CEOC's 5.75% Senior Notes due 2017 entered into a Note Purchase and Support Agreement.  (*Id.* ¶ 17.)  The transaction was

7

completed on August 22, 2014.  (*Id.*)  Under the transaction, the Participating Noteholders transferred to CEC and CEOC approximately $89.4 million of the Notes and $66 million of 2017 Notes and consented to amendments to the indentures governing the 2016 and 2017 Notes to remove CEC's guarantee.  (*Id.*)  In total, the transaction reduced CEOC's outstanding debt by $582 million, at a cost to CEOC of only $78 million.  (*Id.*)

## IV.     The Relationship Between CEC and CEOC Following the May Transactions

Beginning in June 2014, significant changes in CEOC's corporate governance were put in place affecting the relationship between CEC and CEOC.  Before June 27, 2014, CEOC's Board consisted of two employee directors.  On that date, one of those directors resigned and six new Board members were appointed, including two independent directors.  (*Id.* ¶ 18.)  Early in July, the independent directors of CEOC's Board selected independent legal counsel.  (*Id.*)

On July 30, 2014, a Governance Committee was formed on CEOC's Board, with the two independent directors as its only members.  (*Id.* ¶ 19.)  The committee was granted the power to evaluate any material financial transactions involving CEOC or its assets that required Board approval, and to exercise sole authority to consider and approve any matter involving a material conflict of interest affecting any other director or any person or group owning more than 5% of the company, including CEC.  (*Id.*)  The committee also began an investigation of potential claims by CEOC against CEC, with the assistance of CEOC's independent legal counsel and an independent financial advisor.  (*Id.*)  (The Bankruptcy Court has expressly affirmed the independence of that legal counsel.  *See In re Caesars Entm't Operating Co.*, 15-01145 (Bankr. N.D. Ill.), Dkt. No. 1713 at 13-17.)  The independent directors, together with the other members of the CEOC Board, approved the August Transaction.  (Sambur Decl. ¶ 20.)

**V.     The Restructuring Support Agreement and CEOC's Bankruptcy**

Over 2014, CEC and CEOC acted to enhance CEOC's financial condition and reposition CEOC for an improved gaming market.  (*Id.* ¶ 21.)  As a result of these transactions, CEOC increased its cash reserves by billions of dollars and decreased its debts.  (*Id.*)  It was paying its debts when due and was in compliance with its debt covenants, and CEC had an unqualified opinion on its consolidated financial statements.  (*Id.*)

In December 2014, CEC announced a Restructuring Support and Forbearance Agreement (the "RSA") with certain senior creditors, setting forth the economic terms of a proposed plan for the reorganization of CEOC and other subsidiaries.  (*Id.* ¶ 23.)  Negotiations among representatives of CEC, the debtors, and CEOC's creditors have been ongoing, and it remains possible that another plan will be developed and presented to the Bankruptcy Court, with different distributions to CEOC's creditors, including holders of the 2016 Notes.  (*Id.* ¶ 24.)

## ARGUMENT

Summary judgment may be granted "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"  *Western Heritage Ins. Co.* v. *Century Sur. Co.*, 32 F. Supp. 3d 443, 448 (S.D.N.Y. 2014) (Scheindlin, J.) (quoting *Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 692 (2d Cir. 2012)).  Plaintiffs cannot satisfy that standard here.

**I.     Plaintiffs Fail to Demonstrate that the Guarantee
        Remained in Place Following the May Transactions**

Although Plaintiffs' Motions focus primarily on the August Transaction, that transaction is irrelevant if the Guarantee was released as a result of either or both of the May Transactions.  Plaintiffs fail to show on the undisputed facts that the Guarantee remained in place

following those transactions or that CEC is otherwise precluded from relying on them.  *First*, the Indenture makes clear that the Guarantee is automatically released once CEOC is no longer a "wholly owned" subsidiary of CEC.  MeehanCombs's contention to the contrary finds no support in the law or logic, and at best presents a disputed issue concerning the meaning of the Indenture that cannot be resolved on summary judgment.  *Second*, Plaintiffs have failed to show that CEOC is still "wholly owned" by CEC; at most, whether CEC holds "substantially all" of CEOC's stock is an issue of fact that cannot be resolved on summary judgment. MeehanCombs's reliance on defunct accounting guidance on the unrelated issue of "push-down accounting" does not advance its case.  *Third*, Plaintiffs' contention that CEC is somehow precluded from asserting that the May Transactions released the Guarantee is without merit.

A.    **Section 508 of the Indenture Does Not Preclude Termination of the Guarantee**

MeehanCombs's reliance (MC Br. 11-12) on Section 508 of the Indenture is misplaced.  Section 508 provides that "[n]otwithstanding any other provision in [the] Indenture," the holders' right to receive principal and interest is "absolute and unconditional."  Contrary to MeehanCombs's position and as this Court has indicated, the fact that a guarantee may be "absolute and unconditional" while it is in force does not mean that it may never be released according to its terms.

Under New York law, a contract such as the Indenture should be read to give effect to all of its provisions, and an "interpretation . . . that has the effect of rendering at least one clause superfluous or meaningless . . . will be avoided if possible."  *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Galli* v. *Metz*, 973 F.2d 145, 149 (2d Cir. 1992)).  Consistent with this principle, a "notwithstanding" clause "does not supersede all other clauses in [a contract], only those with which it is in conflict" and

should not be read such that the contract is "interpret[ed] . . . in a manner contrary to the plain intent of the parties." *Beardslee* v. *Inflection Energy, LLC*, 25 N.Y.3d 150, 158 (N.Y. 2015). Thus, "notwithstanding" clauses should be read to "ensure that all terms of a contract are given meaning and, where possible, that the meanings should mesh" rather than in a way that renders other provisions "superfluous." *Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*, No. 04 Civ. 7643 (HB), 2005 WL 289723, at *6 (S.D.N.Y. Feb. 8, 2005).

A guarantee release provision does not conflict with a provision specifying an "absolute and unconditional right" to payment.  This Court concluded in *BOKF* that "simply because a Guarantee may be easily terminated . . . does *not* indicate that the Guarantee was something other than an unconditional guarantee."  2015 WL 5076785, at *7 (emphasis in original).  Similarly, in *Philips Lighting Co.* v. *Schneider*, No. 05 Civ. 4820 (SLT), 2008 WL 4527713, at *4 (E.D.N.Y. Sept. 30, 2008), the court found that an "absolute[] and unconditional[]" guarantee could still be released under common law principles.  As the Fifth Circuit explained, in interpreting an "absolute and unconditional" guarantee under Texas law, "[t]he conditional or unconditional nature of a guaranty has to do only with whether there is a condition precedent to the creditor enforcing the guaranty against the guarantor"—what is known as a "guaranty of payment," rather than a "guaranty of collection."  *United States* v. *Vahlco Corp.*, 800 F.2d 462, 466 (5th Cir. 1986).

The decision in *Bank of New York* v. *First Millennium, Inc.*, 607 F.3d 905 (2d Cir. 2010), on which MeehanCombs relies, is inapposite.  In that case, the FDIC, as a receiver for a bank, argued that it was not liable for the full amount of notes at issue because the indenture specified a limited pool of funds available for payment.  The court concluded that a provision similar to Section 508 overrode the limited recourse provision because there was an "express[]

11

conflict[]" between them.  *Id.* at 915-17.  The case has no bearing on whether an express provision for *terminating* a guarantee presents such a conflict.[1]  The court also noted that the limited recourse provision in the indenture could not be reconciled with the "absolute and unconditional" right to payment provided on the notes themselves specifying that the "repayment right super[s]edes both the terms of the indenture and all other provisions of the note," and that under New York law, the terms of a note control over the terms of ancillary documents in the event of a conflict.  *Id.* at 918.  That principle cuts the other way here, because the Notes specify that CEC's obligations as guarantor are "expressly set forth in Article 15 of the Indenture." (Danner Compl. Ex. Q at 6.)

Thus, Section 508 does not "trump" Section 1503.  And, to the extent the Court finds any ambiguity on this score, the Motions should be denied.  *See Hoyt* v. *Andreucci*, 433 F.3d 320, 331 (2d Cir. 2006) (ambiguous contract language "presents a question of fact to be resolved by a jury."); *Thompson* v. *Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) ("Where contractual language is ambiguous . . . summary judgment is inappropriate.").

## B. Whether CEOC Was "Wholly Owned" By CEC Following the May Transactions Cannot be Resolved on Summary Judgment

Courts have repeatedly found that a "substantially all" standard is fact-specific and not amenable to summary judgment.  *See, e.g.*, *In re Nantucket Island Assoc. Ltd. P'ship*

---

[1]  Other cases cited by MeehanCombs in which "notwithstanding" clauses were interpreted to override other contract provisions (MC Br. 11 n.5) are similarly inapposite.  *See Cisneros* v. *Alpine Ridge Grp.*, 508 U.S. 10, 17-18 (1993) (conflict between provision that rent on assisted housing units could be increased annually by prescribed adjustment factor without limitation and provision stating that "notwithstanding any other provision[,]" adjustments shall not result in material differences in rents charged on assisted and unassisted housing units); *Morse/Diesel, Inc.* v. *Trinity Indus., Inc.*, 67 F.3d 435, 438-39 (2d Cir. 1995) (conflict in contract between contractor and sub-contractor where one provision stated that sub-contractor was entitled to recover costs as result of delay in construction project "notwithstanding any other provision contained in [the] agreement" and provision in which sub-contractor waived any claims for damages resulting from delay in construction project).

*Unitholders Litig.*, 810 A.2d 351, 370 (Del. Ch. 2002) ("discretion to resolve whether a particular sale involved 'substantially all of the assets' of an entity on a motion for summary judgment is necessarily constrained."); *Winston* v. *Mandor*, 710 A.2d 835, 843 (Del. Ch. 1997) (denying motion to dismiss because "whether there is a sale of substantially all [of a company's] assets depends upon the . . . characteristics of the transaction . . . [and] is factual in nature.").

Where, as here, the meaning of "substantially all" cannot be clearly ascertained, resolution on summary judgment of whether CEOC remains "wholly owned" by CEC is inappropriate. *See, e.g.*, *Union Ins. Soc. of Canton, Ltd.* v. *William Gluckin & Co.*, 353 F.2d 946, 952 (2d Cir. 1965) (reversing grant of summary judgment because relevant contract language was ambiguous even where "the parties may be able to adduce but little additional competent evidence before the fact-trier on the issue of intent" of the parties); *Caldor, Inc.* v. *Mattel, Inc.*, 817 F. Supp. 408, 411 (S.D.N.Y. 1993) (denying summary judgment motions in action concerning guarantee of former subsidiary's debts, where use of the term "wholly owned subsidiary" was ambiguous as to whether it was a term of limitation or description and evidence of intent was "inconclusive"); *Sharon Steel Corp.* v. *Chase Manhattan Bank, N.A.*, 88 F.R.D. 38, 43 (S.D.N.Y. 1980) (denying summary judgment on claims involving interpretation of indentures permitting assumption of a third party's obligations "by a corporation that purchases all or substantially all" of its property, where phrase was "not wholly unambiguous"); *Neonex Int'l Ltd.* v. *Norris Grain Co.*, 338 F. Supp. 845, 852 (S.D.N.Y. 1972) (denying summary judgment where relevant language was ambiguous, even where it was "uncertain" whether extrinsic evidence would be proffered at trial).

MeehanCombs nevertheless contends that CEOC remains a "wholly owned subsidiary" under Regulation S-X based on two pieces of accounting guidance—FASB

13

Emerging Issues Task Force Topic No. D-97: Push Down Accounting, Apr. 18-19, 2001 ("EITF D-97"), and SEC Staff Accounting Bulletin No. 112, 74 Fed. Reg. 27427 ("SAB 112").  (MC Br. 12-14.)  But these accounting pronouncements are irrelevant and, in any event, are now *defunct*. They have nothing to do with guarantees of public debt, but the unrelated issue of "push-down accounting," the principles governing the financial statements of target companies in certain circumstances following an acquisition.  *See* FASB No. 2014-17 at 19 (Nov. 2014).  And FASB and the SEC last year *abandoned* use of the "substantially-wholly-owned" concept even in that context after FASB concluded that it had been "challenging to define as a conceptually sound, effective, and operable principle."  *See id.* at 22; SEC Staff Accounting Bulletin No. 115, 2014 WL 6480285 (Nov. 18, 2014).

MeehanCombs's contention that EITF D-97 is or was "competent evidence" (MC Br. 12 & n.7) of the SEC's interpretation of Regulation S-X mischaracterizes the document.  The document was not issued by the SEC, and was never approved or endorsed by the Commission. While the document purports to summarize views expressed by "SEC staff," it never identifies the name or position of the SEC staff member whose views it purports to convey, fails to provide the full context (much less the explicit words) of any such statement and does not suggest that the unidentified staff member had the authority to speak for the Commission.

To the extent these accounting pronouncements are relevant at all, they show that whether CEOC remains "wholly owned" by CEC is a fact-laden inquiry that cannot be resolved on the present record.  *First*, under the analysis suggested in the accounting materials, determining whether CEOC remains "wholly owned" by CEC after the May Transactions may rest in part on whether the holdings of CEC should be aggregated with those of the purchasers in the 5% Stock Sale and recipients of the 6% Stock Transfer such that they all constituted a

14

"collaborative group."  (MC Br. 13.)  Under EITF D-97, aggregation is warranted only when investors "both 'mutually promote' the acquisition and 'collaborate' on the subsequent control of the investee company," and "a rebuttable presumption exists that any investor investing at the same time as or in reasonable proximity to the time others invest in the investee is part of the collaborative group with the other investor(s)."  EITF D-97 at 2-3.  Here, there is no evidence that CEC and the other CEOC stockholders "mutually promoted" the acquisition or "collaborated" on the "subsequent control" of CEOC.  Indeed, the evidence—including the installation of new CEOC Board members and the creation of a Governance Committee that has no connection at all to the new investors—is all to the contrary.  Nor is there any basis for a presumption that the new holders of CEOC stock following the May Transactions constituted a "collaborative group" with CEC, which had acquired CEOC years earlier, not in "in reasonable proximity" to those transactions.

Second, determining whether CEOC's minority owners are independent of CEC under EITF D-97 may well require consideration of the capital base of each stockholder, their affiliations with CEC, whether any of the investments in CEOC were made contingent on others, and each stockholder's affiliation with *other* investors.  *Id.* at 3-4.  MeehanCombs argues that the new stockholders' "███████████████████████████████████████████████████████"  (MC Br. 13).  But the facts they cite in support of this assertion establish nothing more than that two of the purchasers in the 5% Stock Sale held CEC stock, that a third held CEOC debt, and that the recipients of the 6% Stock Transfer included CEOC employees.  At most, these facts suggest that the new CEOC stockholders would (like CEC) all have had independent interests in CEOC's success and that the two purchasers with CEC stock may also have benefited from release of the Guarantee.  They do not show that these investors are not independent of CEC.

Nor is "economic alignment" itself sufficient to discharge Plaintiffs' burden to show the absence of any dispute of material fact.

*Third*, under EITF D-97, determining whether the new stockholders maintained the risk of ownership in CEOC stock could require analyzing the source of funds used to acquire CEOC's shares (including whether they were provided or guaranteed by someone else), whether those shares were acquired at fair value, and whether each stockholder's risk is proportionate to its holding and independent (*i.e.*, not mitigated by the provision of funds or a guarantee by another investor).  EITF D-97 at 3.  MeehanCombs does not address these matters, claiming only that because the minority holders received supposed "███████████████" to hold CEOC stock, their investment risk was mitigated.  (MC Br. 13.)  MeehanCombs cites the fact that one of the purchasers in the 5% Stock Sale entered into a separate agreement to sell CEOC notes set to mature in 2015 back to the company (*id.*), but the economic terms of that transaction were *identical* to those that other holders of the same notes received in a subsequent tender offer. (Sambur Decl. ¶ 14.)  MeehanCombs also cites the fact that the other purchasers in the 5% Stock Sale held CEC stock and that the recipients in the 6% Stock Transfer received payments to offset accompanying tax liability (MC Br. 13), but none of this means that any of them were insulated from the risk of potential losses on their CEOC shares.[2]

---

[2]   For no apparent reason, MeehanCombs also notes in their Rule 56.1 Statement (¶ 76) that one recipient in the 6% Stock Transfer referred to the stock as "worthless" in correspondence with her tax advisor, but they fail to disclose that this employee testified in deposition that she recognized the stock had option value and made this comment when she received it because there was no market in which to trade it and, later, following CEOC's bankruptcy. (Hurwitz Decl. Ex. G (Wilfong Dep.) at 50:19-51:20, 133:22-134:9.)   Similarly, MeehanCombs's statement refers (¶ 53) to a presentation in which a financial advisor to CEC noted in April 2014 that it had been unable to calculate a positive value for CEOC stock, but they fail to disclose that the document notes that the same advisor "believe[d] some investors may ascribe option value" to it.  (Hurwitz Decl. Ex. H (Blackstone Presentation).)

*Fourth,* under EITF D-97, potentially relevant factors include any subsequent collaboration among the stockholders, including (i) any restrictions on each investor's independent voting rights in shareholder votes, (ii) any restrictions on each investor's ability to sell its shares, and (iii) the existence of special rights held by any of the holders, such as seats on the subsidiary's board or consent rights.  EITF D-97 at 4.  MeehanCombs does not even address the first of these two issues, and, as to the third, it acknowledges that the new CEOC stockholders had no such special rights.  (*See* MC SMF ¶¶ 100-15.)

*Fifth,* determining whether CEC "controls" CEOC requires consideration of fact-specific issues—including the expansion of CEOC's Board in June 2014, the addition of independent CEOC directors, the creation of a CEOC Board Governance Committee in July 2014 (comprising those independent directors) that was empowered to evaluate material financial transactions and those that might have involved a material conflict with CEC, and the retention of independent legal and financial advisors to investigate potential claims by CEOC against CEC.  MeehanCombs's argument that CEC's "control" of CEOC is the touchstone (MC Br. 13) misreads SAB 112, which specifies that the presence of a "significant noncontrolling interest" is relevant when "*less than substantially all*" of the subsidiary is held by the parent, because that interest might "impact the parent's ability to control the form of ownership"—*i.e.*, a merger or stock acquisition (emphasis added).  All of these facts will likely bear on the question if CEC's control of CEOC is pertinent.

C.   **CEC Is Not Precluded from Asserting that the May Transactions Released the Guarantee**

Plaintiffs also contend that CEC is barred from relying on the May Transactions based on the law of judicial admissions and judicial estoppel.  (*See* Danner Br. 10-12; MC Br. 14-15.)  They misinterpret isolated sentences in CEC's summary judgment papers in *BOKF* and

17

*UMB* as admissions that the May Transactions did not release the Guarantee, while ignoring CEC's direct, repeated statements to the contrary in the very same documents and elsewhere.

Before and during this litigation, CEC has repeatedly stated that the May Transactions released the Guarantee.  Immediately after the 5% Stock Sale, CEC filed a Form 8-K reporting that "[its] guarantee of CEOC's outstanding secured and unsecured notes was automatically released," Form 8-K (May 6, 2014) at Item 1.02, and CEC reiterated that in subsequent filings in May and June 2014.[3]  On the day that the August Transaction was completed, CEC also filed a Form 8-K stating that its guarantee on "CEOC's outstanding secured and unsecured notes" had been released following the 5% Stock Sale and noted that CEOC had provided additional notices to the trustees for outstanding secured notes "reaffirming" its position that CEC's guarantee had been released "as a result of the guarantee of CEOC's unsecured notes being released."  Form 8-K (Aug. 22, 2014) at Item 8.01.  CEC has also consistently and repeatedly stated *in these cases* that the May Transactions released the Guarantee.  *See* Mem. of Law in Supp. of MTD at 6 (Nov. 12, 2014) [*MeehanCombs* Dkt. No. 17; *Danner* Dkt. No. 9) (the Guarantee "was terminated in May 2014, when CEC sold a 5% stake in CEOC").  Significantly, that position was also made clear in the answers CEC filed to Plaintiffs' complaints.  *See* Answer to *MeehanCombs* Compl. at 23 (Feb. 12, 2015) [Dkt. No. 35] (the Guarantee "had already been terminated prior to the . . . August 2014 transaction"); Answer to *Danner* Compl. at 14 (Feb. 25, 2015) [Dkt. No. 29] (same).

Plaintiffs' contention that CEC took an inconsistent position on the motions for partial summary judgment in *BOKF* and *UMB* mischaracterizes the record.  CEC's main brief opposing those motions stated that the August Transaction "provided an independent basis" for

---

[3]   *See* Form 8-K (May 6, 2014) at Ex. 99.3; Form 8-K (May 7, 2014) at Ex. 99.1; Form 8-K (May 30, 2014) at Ex. 99.1; Form 8-K (June 27, 2015) at Item 8.01.

releasing the Guarantee on the 2016 Notes. Opp. to BOKF MSJ at 12. CEC's supporting declaration by David Sambur, a CEC director, does not state otherwise. It states that the 5% Stock Sale was undertaken because lenders in the B-7 Transaction demanded CEC release its guarantee "*under various indentures—including* the BOKF and UMB Indentures." Thus, the declaration reiterates CEC's consistent position that the 5% sale released the Guarantee. Decl. of David Sambur at ¶¶ 14, 20 (Jul. 24, 2015) [*BOKF* Dkt. No. 40] (emphasis added). Mr. Sambur testified in his deposition to CEC's position that the May Transactions independently released the Guarantee. (Hurwitz Decl. Ex. E (Sambur Dep.) at 324:14-325:7, 419:5-21.)

Plaintiffs' reference to CEC's proposed reply in support of its petition to appeal the *BOKF* decision is equally unavailing. They rely in particular on the statement that the "last" of the "Existing Notes" "on which the parent guarantee had yet to be discharged were the unsecured notes that were part of the August Transaction." Mot. For Leave to File Reply Br., Ex. A (Oct. 1, 2015), *BOKF, N.A.* v. *CEC*, Civ. A. No. 15-2827 (2d Cir.). To avoid any possible dispute, shortly after MeehanCombs first asserted that CEC may somehow be precluded from relying on the May Transactions, CEC filed an amended proposed reply, explaining (again) that "CEC's parent guarantee of [the] unsecured notes" that were part of the August Transaction "had been released earlier that year as a result of the same May 2014 transactions that independently released the guarantee on BOKF's notes, but the August transaction provided a separate basis for the release of CEC's guarantee on the unsecured notes." *See* Mot. For Leave to File Am. Reply Br., Ex. B (Oct. 20, 2015), *BOKF, N.A.* v. *CEC*, Civ. A. No. 15-2827 (2d Cir.).

Beyond the fact that CEC repeatedly made its position on this matter clear, Plaintiffs are wrong as a matter of law in arguing that any of these statements can constitute judicial admissions. *First*, the relevant statements at most concern the *legal* effect of the relevant

events, but only statements of *fact* can be binding as judicial admissions.  *See, e.g.*, *Ancile Inv. Co.* v. *Archer Daniels Midland Co.*, No. 08 Civ. 9492 (KMW), 2011 WL 3516128, at \*2 n.1 (S.D.N.Y. Aug. 3, 2011) (conclusions of law "do not constitute judicial admissions.").  *Second*, the relevant statements—even interpreting them in the light most favorable to Plaintiffs—are at best ambiguous as to the effect of the May Transactions on the 2016 Notes, and contrary to other parts of the same filings in which they were made and to CEC's consistent position publicly and throughout the litigations.  *See, e.g.*, *TR 39th St. Land Corp.* v. *Salsa Distribution USA, LLC*, No. 11 Civ. 7193 (DF), 2015 WL 1499173, at \*5 (S.D.N.Y. Mar. 25, 2015) (statement was not a judicial admission because it was not "unequivocal" and because other statements were to the contrary).  *Third*, they cannot serve as the basis for a judicial admission because they were made in separate proceedings.  *See, e.g.*, *Am. Tissue, Inc.* v. *Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004).

The law on judicial estoppel similarly does not support Plaintiffs' position because neither of the two requisites has been met:  "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding; and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment."  *See Mitchell* v. *Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (internal citations omitted).  CEC has not taken an inconsistent position, and the Court's decision in *BOKF* does not rely in any way—explicitly or implicitly—on the relevant statements from CEC's briefing.  MeehanCombs's reliance on the decision in *Republic of Ecuador* v. *Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011) (cited in MC Br. 15 n.10), for the supposed proposition that a favorable judgment is sufficient to support judicial estoppel is also misplaced:  The Second Circuit explained that an "express" adoption of the prior statement is not required, but the court still

must "adopt the position in some manner," *id.* at 389 n.4 (internal quotation marks and citations omitted)—which this Court did not do.

## II.    Plaintiffs Fail to Show that the August Transaction Violated the TIA

Plaintiffs also cannot show that the August Transaction violated the TIA.  This Court held in *BOKF* that "to prove an impairment under section 316(b), plaintiffs must prove either an amendment to a core term of the debt instrument, or an out-of-court debt reorganization," 2015 WL 5076785, at *5, but Plaintiffs establish neither.[4]  *First*, there is no support for the contention that the Guarantee is a "core term"—a conclusion that would be both novel and contrary to widespread market practice.  *Second*, Plaintiffs fail to show that the August Transaction constituted or was part of an "out-of-court debt restructuring"—a question that this Court, in *BOKF*, already concluded involves disputed issues of fact.  *Third*, MeehanCombs's argument that the Guarantee was itself a "security" under the TIA—the removal of which necessarily impaired Plaintiffs' rights—is incorrect under the law.  *Fourth*, even assuming the August Transaction violated the TIA, triable issues of fact would remain as to what—if any—actual damages Plaintiffs suffered.

---

[4]    Although CEC recognizes that the Court has concluded otherwise in its earlier decision in these cases and in the *BOKF* decision, CEC respectfully continues to adhere to the position that Section 316(b) protects only noteholders' legal right to recover under the terms of their indenture—*i.e.*, it protects only against non-unanimous amendments to "core terms" (principal amount, interest rate, and maturity date), and not against noteholders' "practical ability" to recover under their indenture.  In addition to the arguments discussed in footnote 6 below, CEC respectfully reserves its position as to all other arguments advanced in support of its motion to dismiss these actions and in opposition to the motions for summary judgment in *BOKF* and *UMB*.  (See Mem. of Law in Supp. of MTD (Nov. 12, 2014) [*MeehanCombs* Dkt. No. 17; *Danner* Dkt. No. 9]; Opp. to BOKF MSJ (Jul. 24, 2015) [*BOKF* Dkt. No. 44]; Opp. to UMB MSJ [*UMB* Dkt. No. 46].)

21

A.      The Guarantee Was Not a "Core Term" of the Indenture

To our knowledge, no court has ever held that a guarantee of a debt instrument constitutes a "core term" for purposes of the TIA that cannot be amended or removed without the unanimous consent of all holders, and such an unprecedented finding here would disrupt well-established market practice.

The decisions in *Marblegate* and *Federated*—which have been central to the Plaintiffs' claims under the TIA throughout these litigations—make clear that a guarantee is not a "core term."  At issue in *Marblegate* were two provisions permitting the release of the parent's guarantee on the plaintiffs' notes—one providing for an automatic release if senior creditors released a separate guarantee, and the other permitting a majority of holders to eliminate the guarantee through an amendment by a majority of holders.  *Marblegate I*, 75 F. Supp. 3d at 597-98.  *Marblegate I* observed that provisions in indentures governing debt issued under the TIA that permit amendments to remove guarantees are "commonplace in the bond market," *id.* at 612 n.14, reflecting the market's understanding that "core terms" are limited to provisions specifying principal, interest rate, and maturity date.  *See, e.g.*, John C. Coffee, Jr. & William A. Klein, *Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations*, 58 U. Chi. L. Rev. 1207, 1224-25 n.54 (1991) (defining "core" terms as "provisions relating to interest, principal, and maturity").[5]  A conclusion to the contrary would

---

[5]     *See also* Jonathan C. Lipson, *Governance in the Breach: Controlling Creditor Opportunism*, 84 S. Cal. L. Rev. 1035, 1054 (2011) (describing "core provisions" as those governing "maturity date, interest, [and] principal amount"); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 434 (2006) ("The amount and timing of principal and interest due . . . may not be changed without the consent of the individual bondholder, but virtually any other provision of an indenture may be changed by the vote of a group of bondholders (often a simple majority).").

result in precisely the "condemn[ation] [of] widespread market practice" that the *Marblegate* court sought to avoid.  75 F. Supp. 3d at 612 n.14.

The *Marblegate I* court found that the TIA was violated because of "modifications [that] effect an involuntary debt restructuring," not because amending the indenture to eliminate the guarantee was a modification of a core term.  *Id.* at 614.  Had the guarantee been a core term, the Court would have had no need to consider whether a restructuring had occurred.  Rather, the Court specifically said that the guarantee could be "bargained . . . away" *without* violating the TIA, referring to a law review article describing "a significant range of indenture terms, including many that can be used to pressure bondholders into accepting exchange offers," that may be modified without unanimous consent under the TIA.  *Id.* at 615-16 (citing Coffee & Klein, *supra*, at 1224-25).

*Federated* similarly does not hold that a guarantee is a "core term" that can never be modified without unanimous consent.  Instead, it holds only that the removal of a guarantee violated Section 316(b) when coupled with "the simultaneous disposition of all meaningful assets" of the issuer.  *Federated Strategic Income Fund* v. *Mechala Grp. Jamaica Ltd.*, No. 99 Civ. 10517 (HB), 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2, 1999).

This Court's decisions in *MeehanCombs* and *BOKF* likewise do not characterize a guarantee as a "core term."  In *MeehanCombs*, the Court held that Plaintiffs had stated a claim under Section 316(b) on the basis that the August Transaction constituted an "out-of-court debt restructuring" of the Notes—but it did so relying on Plaintiffs' allegations that "CEC's ultimate plan [was] to push CEOC into bankruptcy while protecting [CEC's sponsors] from CEOC's creditors."  *MeehanCombs Global Credit Opps. Funds, LP* v. *Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 509, 511 (S.D.N.Y. 2015).  These allegations are (and were) baseless, Plaintiffs make no

effort to substantiate them and Plaintiffs do not and cannot argue that the Court can determine on summary judgment whether a "restructuring" occurred.  In *BOKF*, the Court observed "that if CEOC had unilaterally adjusted the amount of principal or interest it would pay on a note, that would be an impairment under section 316(b)" and "[s]imilarly, renegotiating a debt obligation with a majority of noteholders to the detriment of a nonconsenting minority *under the same indenture* would be an impairment," 2015 WL 5076785, at *9 (emphasis in original).  The Court did not hold that modifying a guarantee is a *per se* violation of the TIA.

Moreover, as discussed in the accompanying Gadsden Declaration, the characteristics of the Guarantee here provide additional confirmation that it would not be relied upon as a "core term" under the TIA by any investor.  Among other features: (1) the Guarantee by its terms may be released before noteholders have been assured payment, (2) there are no material "cross-default" provisions restricting the parent's ability to operate in a manner that would directly affect its ability to pay the debt, and (3) the Indenture does not contain parent-level "restrictive covenants" that precluded CEC from issuing stock, incurring further debt, selling assets, granting liens or issuing dividends.  (Gadsden Decl. ¶¶ 12, 15.)  All of these features are missing from the Indenture, and make clear the Guarantee should not be considered a "core term."  (*Id.*)

### B.    The Undisputed Facts Do Not Show an "Out-of-Court Debt Reorganization" Under This Court's Decisions

Plaintiffs similarly fail to demonstrate they are entitled to judgment as a matter of law under Section 316(b) through the second of the two paths that this Court has identified—*i.e.*, because there has been an "out-of-court debt reorganization."  This Court already held that whether there has been an "out-of-court reorganization" in connection with the May *and* August Transactions is a disputed issue of fact that cannot be resolved on summary judgment.

24

As an initial matter, MeehanCombs's contention that its "practical ability" to recover under the Notes has been impaired in light of CEOC's bankruptcy and the removal of the Guarantee (MC Br. 10) ignores the "out-of-court reorganization" standard and the policy reasons that motivated it.  The *Marblegate* court rejected the proposition that any act that diminishes a noteholder's "practical" ability to recover violates the TIA in order to avoid a "standardless 'ability to receive payment test'" that would pose the "specter of untrammeled judicial intrusion into ordinary business practice."  *Marblegate I*, 75 F. Supp. 3d at 613-14.  The court concluded that absent the explicit modification of a core term, a bondholder's right to payment is impaired "only" in the case of "an involuntary debt restructuring."  *Id.* at 614.[6]

In *BOKF*, the Court denied summary judgment because there was "a genuine dispute as to whether the challenged transactions, either individually or collectively," constituted an "out-of-court reorganization," and noted in particular the evidence adduced by CEC that the May and August Transactions were "routine corporate transaction[s] . . . undertaken in an effort to *improve* CEOC's financial condition."  2015 WL 5076785, at *11 (emphasis in original).  The Court explained that plaintiffs could only satisfy the "out-of-court reorganization" standard if the factfinder concluded that a restructuring occurred by evaluating various factors, including

---

[6]   CEC also incorporates by reference the arguments made in opposition to the motions for summary judgment in the *BOKF* and *UMB* actions that in order to demonstrate a holder has been "practically" "impaired" under Section 316(b), a plaintiff must also establish both that the issuer was insolvent at the time of the challenged transaction(s) and that there has been an adverse impact on the holders' practical ability to receive payment.  *See* Opp. to BOKF MSJ at 24-28.  Plaintiffs make no attempt to show that CEOC was insolvent at the time of the August Transaction, or that they suffered an adverse impact beyond the mere removal of the Guarantee, but (i) it is far from clear that the Guarantee was ever a realistic source of recovery for the holders, and there is evidence that any diminution in the prospect of repayment resulting from removal of the Guarantee was actually offset by *improvements* in the prospect of repayment by virtue of enhancements to CEOC's financial condition, and (ii) it is similarly unclear that Plaintiffs will receive more or less in the CEOC bankruptcy proceedings than through a claim under the Guarantee on CEC's limited resources.

whether "the transactions involve[d] the restatement of assets and liabilities," whether CEOC [held] talks with creditors in order to make arrangements for maintaining repayments," and whether "the transactions attempt[ed] to extend the life of a company facing bankruptcy through special arrangements and restructuring."  *Id.*  Plaintiffs provide no basis for the Court to reconsider its decision that these issues are unsuited for resolution on summary judgment.  *See* Transcript of 5/26/15 Conference at 33 [*BOKF* Dkt. No. 22] (denial of BOKF's motion would become "law of the case" in *MeehanCombs* and *Danner*).[7]

Finally, contrary to Danner's suggestion (Danner Br. 2), the *MeehanCombs* decision provides no support to Plaintiffs.  As noted above, the Court held at the motion-to-dismiss stage that Plaintiffs had stated a claim that the August Transaction was an "out-of-court restructuring" on the basis of allegations that CEC and its sponsors had orchestrated the transaction as some sort of "plan . . . to push CEOC into bankruptcy" with no assets in order to evade CEOC's creditors, 80 F. Supp. 3d at 511, 516.  CEC believes these allegations are baseless and Plaintiffs do not make the slightest effort here to show that they are well-founded, much less that they can be resolved in their favor on summary judgment.

## C. The Guarantee Is Not a "Security" Under the TIA

The *MeehanCombs* Plaintiffs also contend that their right to payment has been "impaired" under Section 316(b) because the Guarantee was "in and of itself" an "indenture security" and thus could not be removed without their consent.  (MC Br. 9.)  This argument is inconsistent with *Marblegate*—had the guarantee there been considered a "security" under the

---

[7]    While MeehanCombs's statement of undisputed facts references certain other "out-of-court transactions" involving the transfer of CEOC assets (*see* MC SUMF ¶¶ 93-95, 99), their brief makes no reference to them.  In any event, these transactions were among those the Court noted in *BOKF* as having been undertaken to "manage" CEOC's debt, 2015 WL 5076785, at *1, and the Court did not find them sufficient to grant plaintiffs' motions.

TIA, there would have been no need for the Court to focus on the issue of whether there had been an out-of-court restructuring—and accepting the argument would be both contrary to and disruptive to widespread market practice for the reasons discussed above.  Not surprisingly, MeehanCombs cites no cases in support of its novel theory, and the cases make clear that a guarantee of a "security" is not "in and of itself" a security in these circumstances.  Indeed, the argument is little more than a restatement of MeehanCombs's incorrect assertion that the Guarantee was a "core term."

The TIA defines an "indenture security" as "any security issued or issuable under the indenture to be qualified," and "security" is separately defined by reference to the Securities Act of 1933, *see* 15 U.S.C. § 77ccc(1), (11).  In examining whether an instrument is a "security" under this definition, "form should be disregarded for substance and the emphasis should be on economic reality."  *United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 848 (1975).   In determining whether an instrument is a "security," courts "assess the motivations that would prompt a reasonable seller and buyer to enter into [the underlying transaction]"; "examine the plan of distribution of the instrument to determine whether . . . there is common trading for speculation or investment"; "examine the reasonable expectations of the investing public"; and "examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument."  *Reves* v. *Ernst & Young*, 494 U.S. 56, 66-67 (1990) (internal quotations omitted).[8]  The label the parties assign to an instrument is not determinative.  *United Hous. Found.*, 421 U.S. at 848 (rejecting the suggestion that a transaction "evidenced by the sale

---

[8]   *Reves* interpreted the meaning of the term "securities" under the Securities Exchange Act of 1934 but observed that the definition is "virtually identical" to the Securities Act of 1933. 494 U.S. at 61 n.1 (quoting *Forman*, 421 U.S. at 847 n.12).

of shares called 'stock,' must be considered" a security "simply because the statutory definition of a security includes the words 'any . . . stock'").

Applying these principles, "[t]here is little doubt that a guaranty, in and of itself, does not constitute a 'security' under the federal securities law" because it is merely "'an agreement to repay a loan to the lender should the borrower default.'" *See Coan* v. *Bell Atl. Sys. Leasing Int'l, Inc.*, 813 F. Supp. 929, 935 (D. Conn. 1990) (quoting *James* v. *Meinke*, 778 F.2d 200, 204-05 (5th Cir. 1985)).   Other courts have held that guarantees of bonds are not independent "securities" where the guarantees "were neither sold, nor marketed, and could not have been purchased apart from the bonds." *Haberman* v. *Washington Pub. Power Supply Sys.*, 744 P.2d 1032, 1048 (Wash. 1987), *amended*, 750 P.2d 254 (Wash. 1988) (affirming dismissal of claim under 1933 Act premised on theory that guarantees of debt otherwise exempt from the act were themselves "securities"); *see also Woods* v. *Homes & Structures of Pittsburg, Kansas, Inc.*, 489 F. Supp. 1270, 1294 (D. Kan. 1980) (same).  The same applies here: the Guarantee here was a contingent (and terminable) contractual right of holders of the Notes, not a separate investment instrument that was independently sold, marketed, or available for purchase.

Other *Reves* factors cut against finding that the Guarantee was a "security."  The registration statement for the Notes filed with the SEC specifies that "no separate consideration [would] be received for the Guarantees" (Hurwitz Decl. Ex. F), belying any suggestion that investors would have regarded the Guarantee as an independent security.  *See Reves*, 494 U.S. at 66.  Although the statement also identified the Guarantee as a "class of securities" (Hurwitz Decl. Ex. F), a characterization in a registration is irrelevant to a court's independent obligation to assess as a legal matter whether something constitutes a "security."  *See Great Rivers Co-op.*

28

*of Se. Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 699 (8th Cir. 1999).[9]   And MeehanCombs

presents no evidence (because there is none) that the Guarantee alone was somehow "trading for

speculation or investment."  *See id.*

Finally, summary judgment is inappropriate because Plaintiffs' arguments at most

raise unresolved factual questions under the *Reves* test.  *See Fund of Funds, Ltd* v. *Arthur*

*Andersen & Co.*, No. 75 Civ. 540 (CES), 1980 WL 1146, at *4 (S.D.N.Y. Dec. 18, 1980).

### D.  Plaintiffs Fail to Demonstrate Any Actual Damages Resulting from the August Transaction

Summary judgment also should be denied because triable issues of fact exist as to

whether Plaintiffs have suffered any recoverable damages.  Section 323(b) of the TIA provides

that a plaintiff seeking "damages under the provisions of this subchapter" may not "recover . . . a

total amount in excess of his actual damages."  15 U.S.C. § 77www(b).  Section 323(b) applies

to any suit permitted under "[the] subchapter"—*i.e.*, the TIA.  *See Royal Park Invs. SA/NV* v.

*HSBC Bank USA, Nat. Ass'n*, No. 14 Civ. 10101 (SAS), 2015 WL 3466121, at *5 (S.D.N.Y.

June 1, 2015) (Scheindlin, J.).  As this Court held in *Royal Park*, under Section 323(b), plaintiffs

are entitled "to recover only their out-of-pocket losses."  *Id.* at *5.  This Court permitted

plaintiffs in that case to maintain an action under the TIA even "though they ha[d] failed to

allege selling the notes at a loss," but noted that the plaintiffs had alleged diminution in the value

of their notes and explained that "[i]f plaintiffs ultimately prevail, any recovery [would] be

limited to [their] actual damages."  *Id.* at *15.

Here, the record on this Motion includes no facts that would permit the Court to

conclude as a matter of law that Plaintiffs have suffered out-of-pocket losses (such as the prices

---

[9]   Similarly, the SEC's position concerning a particular instrument is not controlling.  *See*
*Woods*, 489 F. Supp. at 1293 (noting that the SEC had advised the defendant that the
guarantee was itself a "security" subject to registration, but rejecting that conclusion).

at which they purchased their Notes and any reduction in recoveries due to the removal of the Guarantee).  Plaintiffs refer to the recovery that they would obtain under the proposed plan for reorganization currently before the Bankruptcy Court, but they provide no evidence that this recovery would give them less than they paid.  And the proposed plan has not been confirmed and may well be revised, making any analysis premature.  (*See* Sambur Decl. ¶ 24.)

## III.   Plaintiffs Fail to Show that the August Transaction Violated the Indenture

Equally meritless are MeehanCombs's contentions (MC Br. 10) that the August Transaction violated the Indenture because the Guarantee is a "Security" under the Indenture, and that Section 902 thus precludes an amendment of the Guarantee provisions.  The Indenture makes clear that the Guarantee is not itself a "Security," but a contingent right of holders of the Notes themselves.  To start, the Indenture describes "Securities" as the "unsecured debentures, notes, or other evidences of indebtedness (*together with* the related Guarantees provided by the Guarantor, the 'Securities')" (*see* Indenture Recitals (emphasis added)), indicating that the Guarantee is merely a component of each "Security"—*i.e.*, each Note.  *Cf. Gibson* v. *City of Kirkland*, 433 F. App'x 539, 541 (9th Cir. 2011) (where Washington statute permitted liquidated damages "together with' attorneys' fees, the "together with" language "implie[d] attorneys' fees must be awarded '[i]n union with' liquidated damages as a single remedy, and not by themselves"); *Hinshaw* v. *M-C-M Props., LLC*, 450 S.W.3d 823, 827 (Mo. Ct. App. 2014) ("The description of both easements in the same sentence connected by the phrase 'together with' indicates the intent to convey related, and not independent, easements.").

This is also clear from the Indenture's more specific definition of "Securities," which specifies that the term "more particularly means any securities authenticated and delivered under this Indenture."  (Indenture § 101.)  *See County of Suffolk* v. *Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) ("courts construing contracts must give specific terms and exact terms . . . greater

weight than general language"). As the Indenture indicates, the Guarantee was *not* separately "authenticated and delivered"; instead, only the Notes were "authenticated and delivered," and they were endorsed to evidence the Guarantee. (Indenture § 1502.)

MeehanCombs's proposed interpretation of Section 902—which, they contend, prevented a majority of holders from agreeing to remove the Guarantee because it was a "Security"—also misreads the provision. As is relevant here, Section 902(1) prohibits amendments without the consent of all holders that would "change" the maturity date of payments due on a "Security," "reduce" principal or interest, or "impair the right to institute suit for the enforcement" of payment after maturity. But the Guarantee contains no maturity, principal or interest rate provisions—lending further support to the conclusion that it was not, in and of itself, a "Security"—and this Court has held that the "right to institute suit" refers to the "right to sue for payment" (as distinct from the "substantive right to receive such payment"), *BOKF*, 2015 WL 5076785, at *9, which has not been disturbed. MeehanCombs's reading of Section 902 should also be rejected as irreconcilable with the detailed release provisions that contemplated a non-consensual termination of the Guarantee. As discussed above, the Indenture includes detailed provisions describing how the Guarantee may be terminated—those provisions would be rendered meaningless by Plaintiffs' novel argument.

**IV.** <u>**Summary Judgment on Plaintiffs' Declaratory Judgment Claims is Inappropriate**</u>

Finally, Plaintiffs' motions for partial summary judgment on their declaratory judgment claims should be denied for the reasons discussed above, but even if the Court were to conclude otherwise, Plaintiffs would still not be entitled to declaratory relief. Indeed, MeehanCombs makes no argument that they are entitled to relief on their declaratory judgment claim—seeking a judgment that the Guarantee remains in effect—and for this reason alone their motion on this count should be denied.

Danner's argument that he is entitled under the Declaratory Judgment Act, 28 U.S.C. § 2201 ("DJA"), to relief on his declaratory judgment claim—that the amendment to the Indenture removing the Guarantee is invalid—fails for two reasons.   *First*, a declaratory judgment claim that is duplicative of affirmative claims for relief serves no useful purpose, and Danner himself concedes that his contract and TIA claims are "necessarily" determinative of his DJA claim (Danner Br. 13).   *See, e.g.*, *Mariah Re Ltd.* v. *Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 622-23 (S.D.N.Y. 2014), *aff'd*, 607 F. App'x 123 (2d Cir. 2015) (dismissing DJA claim as "wholly superfluous" in light of contract claims which "would 'settle the issues for which declaratory judgment is sought'") (quoting *Fleisher* v. *Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012)).   *Second*, declaratory judgment is improper because "declaratory relief is intended to operate prospectively," not "where only past acts are involved."   *Nat'l Union Fire Ins. Co. of Pittsburgh, PA.* v. *Int'l Wire Grp., Inc.*, No. 02 Civ. 10338 (SAS), 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003).   Even assuming Danner is entitled to recover under the Guarantee from CEC, this is no different than a standard contract claim under which a party seeks money allegedly due as a result of a breach.   *See Mariah Re Ltd.*, 52 F. Supp. 3d at 622-23.

## <u>CONCLUSION</u>

For the reasons set forth above, the Motions should be denied.


Dated:  New York, New York
        November 13, 2015

                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                    By:  _____/s/ Lewis R. Clayton_____

                       Lewis R. Clayton
                       Michael E. Gertzman
                       Jonathan H. Hurwitz
                       Ankush Khardori
                       1285 Avenue of the Americas
                       New York, New York 10019-6064
                       (212) 373-3000
                       lclayton@paulweiss.com

                    FRIEDMAN KAPLAN SEILER & ADELMAN LLP

                       Eric Seiler
                       Philippe Adler
                       Jason C.  Rubinstein
                       7 Times Square
                       New York, New York 10036-6516
                       (212) 833-1100

                    *Attorneys for Caesars Entertainment Corporation*